ROBB, Appellee,

v.

LINCOLN PUBLISHING (OHIO), INC., et al., Appellants.

[Cite as *Robb v. Lincoln Publishing (Ohio), Inc.* (1996), 114 Ohio App.3d 595.]

Court of Appeals of Ohio,
Twelfth District, Brown County.

No. CA95–04–007.

Decided Oct. 7, 1996.

596

598

600

*John A. Lloyd, Jr.* and *Jeanette H. Rost*, for appellee.

*James H. Scheper*, for appellants.

GRADY, Judge.

Lincoln Publishing (Ohio), Inc. ("Lincoln") appeals from a judgment of $500,000 for Edward S. Robb, Jr. following a jury trial on Robb's claim for defamation.

Robb served as the Butler County Clerk of Courts from 1968 to 1993. In November 1992, Robb was defeated for reelection by Mark Baden. Lincoln owns and operates the Hamilton Journal News, a newspaper which Robb alleges published defamatory statements about him during the course of the 1992 election campaign.

One of the major issues in the 1992 clerk of courts race concerned Robb's handling of monies that had been deposited with the clerk's office for court costs

and fees. Robb maintained those deposits in an interest-bearing "open items" account until he received a final order from a court advising him how to distribute the remaining funds.

In January 1992, the Auditor of the State of Ohio conducted an annual audit of the clerk's office for calendar year 1991. On March 13, 1992, the auditor sent Robb a letter stating that, as of December 31, 1991, the open items balance exceeded $1,400,000, and that some of the items in the account dated back to 1954. The letter instructed Robb to contact John Holcomb, the Butler County Prosecutor, for an opinion concerning disposition of the funds and to inform the auditor's office of Holcomb's recommendation.

Correspondence was exchanged between Robb's office and Holcomb's office concerning the disposition of the open items balance. In a July 10, 1992 letter, Holcomb's office listed certain tasks Robb's office was to perform regarding each current case. Robb was further advised that his office "must examine all 'open item' cases as quickly as possible to return money being held and to collect money owed to the County." The latter reference appears to concern payment to the county of funds not remitted to depositors because they could not be located or for similar reasons.

On approximately September 8, 1992, Robb received a copy of the auditor's preliminary audit report. Robb also learned that the auditor's office intended to issue citations against his office concerning the handling of the open items account.

Baden obtained a copy of the auditor's preliminary report. On September 14, 1992, Baden issued a press release charging that "State Auditor Thomas Ferguson has found that Eddie Robb has illegally squirreled away nearly 1.5 million dollars in public money that rightfully belongs to the people of Butler County." The press release further stated that "[s]ome of this public money has been held illegally since 1954" and that "with Butler County's finances tottering on the brink, this act of piracy is incredible." The press release continued:

"I doubt that Eddie can figure out who or where the $1.5 million belongs. But one thing's for sure, it is not his money. It is my understanding that a simple court entry could put the money into the general fund tomorrow."

Baden "demand[ed] that Eddie act immediately to pay the money back." Finally, the release stated:

"We need to track down the money, and make Eddie give a full, fair and accurate accounting of every cent. And while we're on the subject of Eddie's antics, I believe we need a full, fair and accurate accounting of not only the missing money but also the missing drug evidence that occurred in the June, 1991, scandal in which his employee's death was ruled a suicide."

On September 15, 1992, Baden attended a meeting of the Butler County Commissioners where he made public the preliminary audit report. On September 17, 1992, the Hamilton Journal News published an editorial criticizing Baden for his release of an audit report that was merely preliminary in nature. In addition, the editorial stated: "If the allegations are true, they are serious indeed. But every indication is that the funds are strictly accounted for."

On September 30, 1992, the auditor issued his final report concerning the 1991 audit of Robb's office. Although the number of citations had been reduced from the preliminary report, four citations were issued concerning the open items account.

"1. The Clerk of Court has not made out and filed itemized bills of costs for numerous inactive cases listed in open items.

"2. The Clerk of Courts has not kept accounts separating inactive and active cases, costs, penalties, percentages and allowances in his open items accounts.

"3. The Clerk of Courts has not paid costs for his Open Items accounts into the County General Fund and balances have not been refunded.

"4. The Clerk of Courts of Butler County is responsible for the following courts. As of December 31, 1991, these balances were:

| "Court | Amount | Items Date Back To |
|---|---|---|
| Court of Appeals | $ 41,204.50 | 1978 |
| Judgments | 25,523.41 | 1976 |
| Criminal | 170,943.70 | 1954 |
| Domestic Relations | 232,806.70 | 1980 |
| Civil | 1,017,265.61 | 1960 |

"The Clerk of Courts has not prepared lists of unclaimed costs for these courts, and has balances in accounts dating back to 1954."

On October 1, 1992, the Hamilton Journal News printed an article reporting on the citations issued to Robb. The article was written by Jamie Bercaw, who had been assigned to cover the 1992 Butler County elections. The article carried a headline stating, "Audit report blasts Robb over $1.5 M." The article stated that "Butler County's cash-strapped general fund could have been boosted by an almost $1.5 million account if the county's clerk of courts office had followed state law, the 1991 state audit of the county says." The article further stated that "[t]he report says as of December 1991, the clerk's open items account had a balance of $1.48 million, but that those open items cases had never been assigned costs." The article quotes the audit report as stating that "[t]he Clerk of Courts has not taken any action to distribute these funds, and the Open Items account continues to grow. If the Clerk of Courts had followed the proper procedure as

required by law, the county would then have had access to additional monies for expenditures."

Robb was quoted in the Bercaw article as stating that "[i]t is clear that the state auditor has allowed his office to be used for partisan politics. There is no question about a shortage of money; it's a question about interpretation of the law." Robb took the position that there was a legal question as to the type of court order required to permit him to close a file and make appropriate cost distributions.

As a part of the 1992 campaign, Robb and Baden attended various "candidates' nights" functions to meet prospective voters. Beginning around September 15, 1992, Baden raised the issue of the $1.5 million at these meetings and Robb explained his position in response. As part of his explanation, Robb said that "[t]here is no money missing. This is an interpretation of law." Further, Robb prepared responses to various accusations Baden had made in anticipation of questions that might be asked of Robb regarding those accusations. In response to Baden's accusation that Robb "illegally squirreled away 1.5 million," Robb's prepared response included the statement: "The money is not missing, it is all there. The issue here is one of interpretation of law."

In an October 2, 1992 article, the Hamilton Journal News reported on Robb's request for an internal investigation of the auditor's office. In that article, Robb was quoted as saying, "There is no money missing. At issue is an interpretation of the law." Robb testified that he was accurately quoted in that article.

The record reflects that articles concerning the auditor's report were printed in other Butler County newspapers prior to October 21, 1992. In at least one of these articles, Robb is again quoted as using the phrase, "There is no money missing."

On October 21, 1992, the Hamilton Journal News printed another article concerning the open items account. This article was written by Gayle Brown and appeared on the front page of the newspaper. Elections were not Brown's regular assignment. However, Brown filled in for Bercaw, the reporter who generally covered the county elections, because Bercaw was not at work on the day Brown's article was written. Brown had started working for the Hamilton Journal News a month earlier as a reporter/clerk, "[w]orking nights and week-ends, typing death notices when they came in, doing mostly whatever nobody else wanted to do." Brown also took over other reporters' assignments when they were away on vacation.

The headline of the October 21 article written by Brown stated: "Shortfall simply not collected. Robb says 'missing' $1.5 M caused by misunderstanding." The text of the article stated:

"The Butler County Clerk of Courts has a financial responsibility to follow state law outlining the proper collection of court costs, regardless of whether the law has been pointed out to him, according to Butler County Prosecutor John Holcomb.

"A 1991 audit, released Sept. 30 by State Auditor Thomas Ferguson, says Clerk of Courts Edward Robb didn't follow up on court fees owed, leaving almost $1.5 million uncollected that could have been deposited in Butler County's general fund. Some of the uncollected fees date back to 1954, the letter states.

"Robb, a 23–year veteran of the job, said releasing the audit so soon before the November election was a political ploy designed to keep him from being reelected.

" 'There is no money missing,' Robb said in a statement. 'It is still there. At issue is an interpretation of the law.'

"But Holcomb said there have been no changes to the law or to the interpretation of the law, as Robb has claimed. What is at issue is Robb's failure to collect court fees in a timely fashion, he said.

" 'I can appreciate Mr. Robb's position a little bit when he says, "Gee, why didn't anybody tell me when I've been doing it this way all these years," ' Holcomb said. 'On the other hand, nobody asked, including Mr. Robb.'

"In March, Ferguson sent Robb a letter listing the uncollected fees, recommending Robb ask the Butler County Prosecutor's office for help.

"Robb wrote to the prosecutor's office. In July, he received from Assistant Prosecutor Victoria Daiker a letter outlining Robb's responsibilities.

" 'The clerk's office * * * must examine all "open item" cases as quickly as possible to return money being held and to collect money owed to the county,' Daiker wrote in closing. 'To ignore long-dormant cases is not only dangerous; it is a violation of the Ohio Revised Code.'

"Robb said he is complying with all of Daiker's recommendations this year, but he can't change last year's audit.

" 'We are making arrangements to comply with the county prosecutor's new ruling,' Robb said."

On October 27, 1992, the Hamilton Journal News published a political advertisement by the Baden campaign. The ad stated in bold letters, "$1.5 million is 'missing.' And so is the L.S.D." The ad depicted partial reprints of three newspaper articles. The October 21, 1992 allegedly defamatory article was not among them; however, the October 1, 1992 Hamilton Journal News article headlined "Audit report blasts Robb over $1.5 M" was included, as were two past articles headlined "Court files searched for drugs" and "No LSD found in body of

court employee." A subheadline states: "Robb's bungling of public trust knows no end." The remaining text of the ad states:

"In the spring of 1991, the unfortunate death of Robb's employee revealed the absence of drug file security.

"To this day, at least 411 'missing' hits of L.S.D. have not been found. No drugs were found in the employee's body.

"In the investigation, Robb's employees said that even cleaning people had access to drug files. 'Files with drugs were left sticking out so they could easily be found again for tours,' one employee wrote.

"Robb's comment was 'the system broke down without my knowledge.' What system?

"More than a year later, Robb still hasn't corrected many of the security problems.

"Missing this. And missing that.

"Don't miss the chance to correct the problems in Robb's office yourself on November 3."

The day following the publication of the ad Robb filed a complaint alleging that he had been defamed by the October 21, 1992 article. Robb alleged that the article falsely portrayed him as guilty of malfeasance in office in failing to obtain fees due the county's general fund, and that the article's allegation of a shortfall in funds not collected by Robb was false. Robb alleged that the article was published with actual malice, and he sought compensation for damage to his reputation and feelings.

On March 10, 1993, Robb filed an amended complaint, expanding his claim of defamation to include five political advertisements for Baden published in the Hamilton Journal News. Included among these five ads was the October 27, 1992 political advertisement described above. Baden and his campaign manager, Rex Richardson, were added as defendants for having composed the alleged defamatory advertisements. Robb alleged that the October 21, 1992 newspaper article and the five political advertisements proximately contributed to his defeat in his campaign for reelection.

In September 1994, trial began on Robb's claims against all three defendants. Defendants moved to dismiss, arguing that Robb's claims were barred by Civ.R. 54(C) because Robb had failed to state a dollar amount of damages in his prayer for relief. At a hearing on September 9, 1994, the court decided in favor of defendants on their motions to dismiss and directed defense counsel to prepare and circulate an entry.

On September 14, 1994, before the court had signed an entry of dismissal, Robb moved for leave to file a second amended complaint that specified a dollar amount of damages in his prayer for relief. Defendants opposed that motion and asked the court to journalize its previous decision of dismissal. On January 17, 1995, the court denied defendants' motions to dismiss and granted Robb's motion for leave to amend his prayer, and rescheduled the case for trial.

Shortly before the start of the second trial, Robb dismissed his claims against Baden and Richardson. The trial proceeded against Lincoln as the sole defendant. Further, Robb pursued his claim of defamation against Lincoln only with respect to the October 21, 1992 article written by Brown and the October 27, 1992 political advertisement placed by the Baden campaign.

Lincoln contended that neither the news article nor the ad by the Baden campaign was libelous. It sought to demonstrate that other factors contributed to Robb's loss of the election, including a highly publicized incident in Cincinnati the year before in which Robb was charged with disorderly conduct.

At trial, Robb contended that the article, including its headline, created the false impression that the auditor had found that Robb's office had $1.5 million less than it should have had because Robb failed to obtain court costs he had a duty to collect. Robb contended that the article's headline furthered the misconception by making it appear that he admitted there was a shortfall when, in fact, he had stated the opposite. Robb also contended that the Lincoln knew that the article was false because, prior to writing it, Brown had information from a number of sources who indicated that the money concerned in the audit report citations was money that Robb had collected and retained in his open items account.

Brown testified that before she wrote the October 21, 1992 article, she was given a folder containing articles written by Bercaw. She recalled that she read the October 1, 1992 article written by Bercaw headlined "Audit Report Blasts Robb Over $1.5 Million." She also testified that she reviewed a list of prepared statements that the paper received from Robb concerning the issue. That list contained the statement "There is no money missing—it is still there. At issue is an interpretation of the law."

Brown also testified that she reviewed letters from the auditor's office. She also reviewed correspondence between Holcomb's office and Robb's office concerning the open items account, including the July 10, 1992 letter referenced previously herein. Brown testified that she did not recall seeing Baden's press release of September 14, 1992, nor was she given the Hamilton Journal News editorial of September 17, 1992 containing the statement that "every indication is that the funds are strictly accounted for."

Brown also reviewed the citations listed against Robb in the auditor's report. Brown testified as follows regarding citation number 4:

"Q. Okay, and you recognized, did you not, that the balances were in an account in the Clerk of Courts, that the state auditor had audited and that's how she got these numbers?

"A. No, I recognized that this money was not collected in the correct fashion and that's why the citations were issued.

"Q. Well, let's just look at this citation.

"A. I mean the next line I quoted in the article, the Clerk of Courts has not prepared lists of unclaimed costs for these Courts, and has balances in accounts dating back to 1954.

"That is in the article.

"Q. Do you understand what a balance in an account is?

"A. Yes, I have a degree in business, I can read. What it says he didn't collect it correctly and did not, didn't put it in the general fund.

"Q. Do you understand the balances in an account means, mean that is in that account?

"A. This means uncollected balances, has balances in accounts dating back to 1954. He's telling he hasn't collected them.

"Q. Where does it say uncollected?

"A. Has not prepared lists of unclaimed costs."

Brown also interviewed Holcomb to obtain an interpretation of the Ohio Revised Code. She testified that she came away from her conversation with Holcomb "with an understanding that there was money out there that had not been collected and put in the correct columns on a balance sheet when they collect funds and close accounts, so the county did not have the money."

Brown also interviewed Robb before she wrote her article. Robb told Brown that the money was in the open items account and that he had handled it the same way for all the years he had been clerk of courts. Brown testified that she quoted Robb in the article from her conversation with him.

Timothy Smith, a professor of journalism at Kent State University, and an attorney, testified for Lincoln. Smith opined that Brown followed standard reporting practices in putting together the October 21, 1992 article. He testified that Brown's reliance on the auditor's report and statements by Holcomb in drawing her conclusions about the auditor's report was an appropriate reporting technique. On cross-examination, Smith agreed that he saw nothing in the auditor's report that referred to the funds being "uncollected" and did not recall

anything in the report that talked about a "shortfall." However, he testified that Brown's summation of the auditor's report was accurate.

Smith also testified that it was not necessarily good journalistic practice for a reporter to familiarize herself with the newspaper's editorial position when writing an article. According to Smith a reporter should write articles about facts, not to make the article conform to the editorial page.

Smith also testified regarding the headline used in the October 21, 1992 article. Smith felt that the headline accurately summarized what the article was about and was consistent with the article.

Smith stated that in headline writing, the use of quotes around a word meant either that someone's own statement was being used in the headline or that the word carried a special meaning. In this instance, the use of quotes around "missing" indicated that it was a statement by Robb, and in that context the use of the word "missing" was appropriate as it was a direct quotation of what Robb had said.

Smith also testified that the phrase "Robb says 'missing' $1.5 M caused by misunderstanding" does not convey the impression that Robb is acknowledging the $1.5 million is missing, but says that its status is due to a misunderstanding. Smith testified that "that term indicates in that headline that that money isn't missing in the standard sense that it's disappeared. It's that it's not where it's supposed to be. And the misunderstanding refers to that language, that quote, interpretation of law. There is not enough room to say interpretation of law in that headline."

Robb sought to prove that the October 27, 1992 Baden political advertisement defamed him by conveying a false impression that Robb was either incompetent or a thief in that the headline of the ad implied that both $1.5 million of public money and drug evidence had been lost or stolen from his office. Robb contended that the ad was false as the $1.5 million was not missing, but was instead in the open items account. Robb further contended that Lincoln's managing editor, Ozzie Kleinas, knew that the ad was false and misleading when he approved it for publication.

Kleinas testified extensively at trial concerning the Baden political ad. Kleinas testified that he participated in the discussion leading up to the Journal News' editorial of September 17, 1992 stating that "every indication is that the funds are strictly accounted for." When the editorial was published, it was Kleinas's belief that those funds were strictly accounted for. He also testified that it was his impression that the funds that were actually collected were strictly accounted for. When Kleinas reviewed the October 27, 1992 ad, it was his belief that the funds deposited in the open items account were accounted for.

Kleinas further testified that the $1.5 million was *missing* from the county general fund and was *missing* from the standpoint of the taxpayers of Butler County. Kleinas stated that that money is essentially missing because it was not available to county government to provide services. Kleinas testified that, from a very particular perspective, the statement "$1.5 million is missing" was a statement of fact and is accurate if "missing" means the money is not where it is supposed to be. Kleinas acknowledged that the auditor did not say that the $1.5 million was missing, but did say that the money should have been remitted and was instead in an account to which the county government had no access.

Kleinas testified that the ad was not an attempt to create the impression that just as LSD had been stolen, so had the $1.5 million. Kleinas thought "it would be stretching a lot" to suggest that a reader would remember the stories concerning the LSD in June 1991 when viewing the ad in October 1992 so as to make that connection. Kleinas testified that the ad doesn't say that any money was stolen and in all the stories that were printed prior to the ad, none of them ever suggested that the money was stolen.

In response to a question as to whether the ad was an enormous distortion of fact designed to hurt Robb, Kleinas testified as follows:

"A. Well, I don't know that this is any more of a distortion than any other ad in a highly negative campaign.

"When you're dealing with political campaign advertising, you are not dealing with balanced truth. You're way, way, in some instances from that. You're dealing with someone who is getting as close as they can to telling a lie.

"But from one perspective what they're saying is contrived in such a way that, yes, strictly if you look at it that way, it's true."

Kleinas also testified that the ad was no worse than many ads routinely published during election campaigns. Kleinas also testified that it was a common practice for candidates in a negative campaign to make statements just short of a lie, and that this ad was not as close to that line as others.

Kleinas testified that it was not his job to scrutinize the intent of an ad and that it was not his job to control political discourse in Butler County. If the proponent of an ad could demonstrate that the ad could be true, Kleinas felt that he had no choice but to accept the ad for publication.

Kleinas testified that most advertising contains some half truths, and that you're lucky to get half. He also stated that he didn't believe the ad at issue was misleading and that he's seen ads much more misleading than that.

Finally, Kleinas testified that when he approved the ad he did not believe that it conveyed an impression that money was taken or that Robb had taken any

money. To Kleinas's knowledge, there was nothing in the ad that was false and the ad was not published with any conscious and willful disregard for Robb's rights.

Baden testified that he never implied in any of his advertisements that Robb had stolen anything, and believes that none of his ads gave that impression. When the term "missing" was used in the ad with respect to the $1.5 million, it meant that the money was missing from its rightful owners because it should have been in the general fund. Baden testified that his definition of the word missing is that "it's not present where it's supposed to be," and that he never intended to give any other impression by use of that word in his ads. He also testified that he did not intend or imply in any of his ads that Robb had done anything illegal at any time.

Smith testified that, with respect to the standard for the publication of political ads, such ads receive a little more leeway, and that people who publish such ads would give them a little more ground to stretch the truth than they would give commercial advertising.

Smith testified that the use of quotes around "missing" indicated that the word was being used in a specialized sense. He further testified that if Robb had stated during the campaign that "money is not missing," it would be appropriate in a political ad for Baden to state "the money is missing," especially with the quote around the term "missing." Smith also testified that to say "$1.5 million is missing" alters and twists around the meaning of Robb's statement "no money is missing." Finally, Smith testified that Kleinas's view that when dealing with political advertising, you're dealing with someone who is getting as close as they can to telling a lie is a commonly held view among journalists.

Michael Fox, a state representative from the Hamilton area, testified that any reasonable voter would interpret the ad as meaning that Robb was either incompetent or dishonest. Fox testified that by linking the money issue to the drug issue in a headline, the ad would cause a reasonable person to believe that Robb had lost or taken the money and could not account for it. Robb testified that the ad "[c]alled me a thief. It equated the $1.5 million as being stolen like the drugs were stolen."

With respect to damages, Robb testified that the article and the ad affected him personally in a number of ways. He testified that he lost his job, could never again run for political office, that he withdrew from the public, stayed at home, couldn't sleep at night, and had developed a case of shingles.

Robb also contended that he lost the election as a result of the alleged defamations. He sought to recover the economic damages he claimed were caused by that loss. He presented an economics expert, Dr. Robert Wessell, who

was asked to calculate the present value of the difference between the income Robb will receive for the remainder of his life and the income Robb would have received had he been reelected in 1992 and served out that term. Wessell calculated that difference to be $178,000, which consisted primarily of lost wages and pension benefits. Although challenging Wessell's conclusions on cross-examination, the defense did not present an economics expert of its own.

Robb testified that, in his opinion, the article and ad were devastating to his campaign. He also stated that, in his opinion, he lost the election because of the article. Fox testified that, in his opinion, the article and ad were very damaging.

Robb also offered testimony from a political scientist, Dr. Alfred Tuchfarber, who testified that he "conduct[ed] a study to determine the direct and indirect political impact of the Hamilton Journal News' coverage of the 1992 Robb–Baden Clerk of Courts election." In the course of his study, Tuchfarber reviewed a number of ads and newspaper articles that appeared in the Hamilton Journal News and other newspapers serving Butler County during the 1992 campaign, including the October 21, 1992 article and the October 27 political ad.

Tuchfarber testified that as a result of his study, he reached eight major conclusions:

"1. Butler County * * * is a solidly Republican county.

"2. [O]ther things being equal, a Republican candidate running for county-wide elective office in Butler County will usually be elected.

"3. Robb consistently won re-election for clerk of courts by a large margin against Democratic opponents throughout the 1970's and '80's.

"4. Robb was historically a very strong candidate in the City of Hamilton, Ohio, only slightly less strong than in Butler County as a whole.

"5. Robb entered the 1992 general election campaign after the June '92 primary election with his historical electoral support substantially intact.

"6. [T]here is compelling statistical evidence of a very strong relationship between the circulation of the Hamilton Journal News and the fall off in the Robb vote from 1988 to 1992. This strongly supported the conclusion that the coverage of the Robb–Baden election by the Journal News had a substantial impact on the percentage of votes received by Robb in '92 and the Journal News circulation areas. The statistical evidence strongly supports the conclusion that Robb would have won the 1992 election except for the unique actions of the Hamilton Journal News.

"7. [I]t is also highly likely that the use other [sic] Hamilton Journal News headline and text by the Baden campaign in their campaign advertising and

materials cost Robb substantial numbers of votes in Butler County outside the Hamilton Journal News circulation areas.

"8. [T]he combination of the Hamilton Journal News coverage of the Robb–Baden election as well as the effective use of that coverage by the Baden campaign in their materials and ads almost certainly led to the loss by Edward Robb of the Clerk of Courts position he had held since 1968."

Tuchfarber also testified that the statement "$1.5 million is missing" is a devastating piece of political communication. He testified that for that information to come out in the middle of a political campaign is very damaging to an office holder because it seems to imply that he either pocketed the money or lost it. Tuchfarber stated that voters will not let an elected official get away with misusing their tax money.

On cross-examination, Tuchfarber conceded that he did no polling of any of the people who had voted in the Robb–Baden contest. He testified that he came to the conclusion that all of the ads placed were effective against Robb.

Tuchfarber further testified that repeated use of the concept of $1.5 million being missing was effective and that the Baden campaign was skillfully built on what was already out there, in particular that $1.5 million missing. Finally, Tuchfarber testified as follows:

"Q. You would agree that there was an accumulation of a lot of different things that led Robb to lose votes, isn't that true?

"A. Yes, sir.

"Q. Some of that was missing drugs, name calling, the arrest, citations from the Auditor's office, the fact that he hadn't turned the money over to the general fund. Those were some of things that led to his loss, correct?

"A. Some of those things could have affected his votes, yes.

"Q. Page 49, I want to go over what your statement was, so I'm clear.

" * * *

"Is that your conclusion in this case that the cumulative effect of the ads and articles over a period of time affected the election?

"A. I think the accumulation of a lot of these different things led Mr. Robb to lose a lot of votes.

"Q. Do you remember that?

"A. Yes, sir.

"Q. Cumulative, would have been, one, missing drugs; that would have been one issue?

"A. Yes, that would be one of the issues.

"Q. Two, name calling, the citation and arrest in Cincinnati?

"A. Yes.

"Q. The fact that there were citations from the Auditor's office?

"A. Yes.

"Q. And the fact that he had not turned money over to the general fund which was in dire need at that time would be another?

"And your answer was, I'm not sure those are separate.

"Do you remember that?

"A. Right.

"Q. You can't state which event or which ad caused which votes, true?

"A. I can't say whether any one ad caused an exact loss of votes. It's the pattern that's important here.

"Q. It's the repetition?

"A. The repetition. The primary and secondary effect of ads.

"Q. You would agree generally that one article appearing one time before voters' eyes isn't likely to do a whole lot of damage, right?

"A. Yes."

At the close of Robb's case, and again at the close of all the evidence, Lincoln moved for a directed verdict. As grounds for the motion it argued that Robb failed to prove that the article or ad was defamatory, that he failed to prove that any special damages resulted from the alleged defamatory statements, including the loss of the election, that he failed to prove that the article or the ad was false, and that he failed to prove by clear and convincing evidence that Lincoln published either of the alleged defamatory statements with actual malice. The trial court overruled Lincoln's motion. The trial court also overruled Robb's motion for a directed verdict finding that the publications were libelous *per se.* The court submitted the case to the jury for a determination as to whether the statements were libelous *per quod.*

After deliberation, the jury returned a verdict in favor of Robb with respect to the news article and awarded damages in the amount of $100,000. The jury answered interrogatories in which it found that Robb had proved the article to be libelous *per quod* and to have been published with actual malice. The jury also answered an interrogatory in which it found that Robb was entitled to general damages of $15,000 and special damages of $85,000 concerning the article.

The jury also returned a verdict in Robb's favor on the Baden political ad, and it awarded damages of another $100,000. In interrogatory answers, the jury again found that Robb proved the ad to be libelous *per quod* and to have been published with actual malice. The jury similarly found Robb to be entitled to general damages of $15,000 and special damages of $85,000 concerning the political ad.

Finally, the jury returned a third verdict form in favor of Robb, awarding him $300,000 in punitive damages. The verdict form did not separate the punitive damages between the two publications, nor were any interrogatories submitted to the jury in that regard.

The court entered final judgment for Robb in the aggregate amount of $500,000 in accordance with the jury's verdicts. In its judgment entry, the court described the jury's punitive damages verdict as having been awarded "on account of both publications." Lincoln filed a timely notice of appeal from that judgment and now presents eight assignments of error.

Assignment of Error No. 1:

"The trial court erred in overruling appellant's motion for a directed verdict in this case."

Pursuant to Civ.R. 50(A), any party to an action may make a motion for directed verdict at the close of an opponent's evidence. The motion may also be made, or may be renewed, at the close of all the evidence.

The usual ground for a motion for directed verdict is that the evidence produced is insufficient to create a jury issue. The test for granting or denying the motion on that basis is set out in Civ.R. 50(A)(4):

"When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

A motion for a directed verdict that alleges insufficiency of the evidence presents only a question of law: whether the evidence, viewed in a light most favorable to the party against whom the motion is made, is sufficient to warrant sending the case to the jury. *Mahoning Natl. Bank v. Youngstown* (1944), 143 Ohio St. 523, 28 O.O. 462, 56 N.E.2d 218. Resolution of the issue does not permit the court to weigh the evidence. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 21 O.O.3d 177, 423 N.E.2d 467. Instead, the court must assume the truth of the evidence supporting the facts essential to the claim of the party against whom

the motion is directed, and give to that party the benefit of all inferences which that evidence reasonably creates. *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 23 O.O.3d 115, 430 N.E.2d 935.

 The "reasonable minds" test of Civ.R. 50(A)(4) calls upon the court to determine whether there exists any evidence of substantial probative value in support of the adverse party's claim. *Hamden Lodge v. Ohio Fuel Gas Co.* (1934), 127 Ohio St. 469, 189 N.E. 246. With respect to such evidence, the court's inquiry goes to its materiality, not to its weight. *Ruta v. Breckenridge–Remy Co., supra.*

Lincoln argues that the trial court erred when it failed to grant its motion for directed verdict because the evidence was insufficient in several respects to prove Robb's claim for relief. The particular grounds on which Lincoln relied, and which it presents as issues for determination on appeal, are set out below:

"1. The Trial Court erred in failing to direct a verdict because Appellee failed to prove that the Journal News published either the article or the ad with actual malice.

"2. The Trial Court erred in failing to direct a verdict on Appellee's claim for the Hamilton Journal News article because the article was accurate.

"3. The Trial Court erred in overruling Appellant's directed verdict motion with respect to the Baden political ad because the ad is an accurate reference to a specifically defined political issue.

"4. The Baden political ad is not actionable under defamation law because it is protected by the First Amendment to the Ohio and U.S. Constitution."

 A libel is a false and malicious publication against an individual made with an intent to injure his reputation or to expose him to public hatred, contempt, ridicule, shame, or disgrace or to affect him injuriously in his trade, business or profession. It is defamatory, and actionable at law, if as a proximate consequence of the libel the individual against whom it is published occasions a pecuniary loss. *Associated Consumers & Dealers v. Better Business Comm.* (App.1925), 3 Ohio Law Abs. 527.

 The First Amendment to the United States Constitution prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice," that is, with knowledge that it is false or with a reckless disregard of whether it was false or not. *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686.

Section 11, Article I, of the Ohio Constitution states: "Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for

abuse of the right; and no law shall be passed to restrain or abridge the liberty of speech, or of the press." This section is analogous to the freedom of speech and the press clauses in the First Amendment to the United States Constitution.

■ To come within the *New York Times v. Sullivan* rule, two prerequisites must be met: (1) the plaintiff in a defamation action must have the status of a "public official," or an equivalent status; and (2) as to the public official, the defamation must relate to his official conduct. It is undisputed that both prerequisites were met in this instance.

■ Maliciousness sufficient to satisfy the *New York Times v. Sullivan* rule must demonstrate either that the defendant possessed a high degree of awareness that the statement he published is false, *Garrison v. Louisiana* (1964), 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125, or that the defendant published the statement despite serious doubts as to its truth. *St. Amant v. Thompson* (1968), 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262. In the case of a political ad prepared by others, proof of actual malice on the part of a defendant newspaper that publishes it requires evidence either that the defendant actually knew before its publication that the ad was false or that the ad is so inherently improbable on its face that the defendant must have realized that the ad was probably false. *Varanese v. Gall* (1988), 35 Ohio St.3d 78, 518 N.E.2d 1177.

■ When a claim is made that a newspaper headline or the item to which it is attached is defamatory, they must be construed together in determining the defamatory effect of either. *Painter v. E.W. Scripps Co.* (1957), 104 Ohio App. 237, 4 O.O.2d 388, 148 N.E.2d 503. If they are false and were published with a malicious intent, they constitute a libel that will support an action for defamation. *Becker v. Toulmin* (1956), 165 Ohio St. 549, 60 O.O. 502, 138 N.E.2d 391.

■ A plaintiff public official who alleges defamation with respect to his official conduct has the burden to demonstrate with "convincing clarity" that the defendant published the false statement with actual malice. *Perez v. Scripps–Howard Broadcasting Co.* (1988), 35 Ohio St.3d 215, 520 N.E.2d 198. "The inquiry into actual malice in a public-official defamation case should focus on the publisher's attitude toward the truth rather than upon the publisher's attitude toward the plaintiff." *Id.* at paragraph one of the syllabus. "On appeal, the appellate court must exercise its independent judgment in deciding whether the evidence of record meets these tests." *Id.* at 218, 520 N.E.2d at 202, citing *Bose Corp. v. Consumers Union of United States, Inc.* (1984), 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502.

■ If the false meaning of a news article derives from a direct understanding of the words used in it, the statement is libel *per se*. *Becker v. Toulmin,*

*supra.* Where the words used are ambiguous or uncertain as to their meaning, but they reasonably create an implication that is false and were published with a malicious intent, they are libel *per quod. Id.* Libel *per quod* is actionable, however, only if the words used are not reasonably subject to an innocent interpretation and only if special damages are proved. *Id.;* see *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 6 OBR 421, 453 N.E.2d 666.

■ The headline attached to the Brown article describes the funds concerned in the auditor's report as a "shortfall simply not collected." The words "uncollected" and "failure to collect" are then used throughout the article. Neither the headline nor the article employ the term "collect" to refer expressly to a transfer of funds by Robb from his accounts to the Butler County general fund. Instead, Robb's failure to transfer funds is described as a "shortfall," which is reasonably understood to mean a *deficit* or a *shortage.* See Webster's Third New International Dictionary (1986) 2103. These concepts give a particular meaning to the word "missing" as it is used in the subheadline and the text of the article, which is that funds for which Robb was responsible had disappeared because they are not where they once were and should yet be. All those meanings are false.

Based on the foregoing considerations, we cannot find that the trial court erred when it denied Lincoln's Civ.R. 50 motion for a directed verdict with respect to the Brown news article. Reading the evidence in a light most favorable to Robb, as the court was required to do, there was evidence from which the jury could reasonably find that the article was false and that it was published in reckless disregard of the truth. The trial court was not permitted to weigh that evidence in resolving the Civ.R. 50 motion before it.

■ Nevertheless, we are required to exercise our independent judgment in determining the ultimate issue, *i.e.,* whether the plaintiff in an action of this kind has demonstrated, with convincing clarity, that the statements of which he complains were published with a malicious intent. *Perez v. Scripps–Howard Broadcasting Co., supra; Urbana ex rel. Newlin v. Downing* (1989), 43 Ohio St.3d 109, 539 N.E.2d 140. Under the libel *per quod* standard, which applies to the statements in the Brown news article, malicious intent is not proved if the statements are reasonably subject to an innocent interpretation. *Becker v. Toulmin, supra; Yeager v. Local Union 20, supra.*

■ The news article and (especially) its headline are examples of one of the worst excesses of contemporary journalism: a "spin" put on facts to get the attention of the reader that distorts their true meaning. To the extent that it represents that monies were missing from Robb's custody, the article is false. However, a discerning reader may yet understand from it that Robb was cited by

the auditor for failing to "collect" monies from his own accounts that he was required by law to remit to Butler County, and that is true. The words used in the article are, therefore, reasonably subject to an innocent construction, and malicious intent is not demonstrated. As a public official whose official conduct is concerned in the article, Robb may not maintain an action in defamation on account of them. *Id.*

The Baden ad is different from the Brown news article, however. It directly and specifically analogizes the "missing money" to the LSD that disappeared from Robb's custody. Use of quotation marks around the word "missing" does nothing to present the true facts. No innocent construction is available from the statement made in it. Furthermore, there is sufficient evidence from which a jury could find that Lincoln published it with knowledge that it was false, which demonstrates actual malice. *Varanese v. Gall, supra.* The trial court did not err when it denied a motion for directed verdict.

We are also required to exercise our independent judgment as to whether Lincoln's publication of the Baden political ad is defamatory and actionable as such. That determination requires us to find that the statements made in it, if false, were published with a malicious intent.

Lincoln relies on *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 649 N.E.2d 182. That case involved a defamation action brought by a candidate for public office against a newspaper and one of its editorial columnists. The defamation claimed arose from statements published by the defendant that accused the plaintiff of "gay-bashing," of using "neo-numbskull tactics" in her election campaign, of "hate-mongering," and like assertions. The trial court dismissed the action, finding that the statements were constitutionally protected opinion. The court of appeals reversed in part, finding some of the statements were actionable. The Ohio Supreme Court reversed the court of appeals, holding that the statements were opinion protected by Section 11, Article I of the Ohio Constitution. The court held that Ohio's constitutional provision extends protections to opinion, citing *Scott v. News–Herald* (1986), 25 Ohio St.3d 243, 25 OBR 302, 496 N.E.2d 699, a protection not found in the First Amendment. See *Milkovich v. Lorain Journal Co.* (1990), 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1.

Whether allegedly defamatory language is fact or opinion is a question of law to be decided by the court from the totality of the circumstances. *Scott v. News–Herald, supra.*

"Specifically, the court should consider: the specific language used, whether the statement is verifiable, the general context of the statement, and finally, the broader context in which the statement appeared. *Scott, supra,* at 250, 25 OBR

at 308, 496 N.E.2d at 706. This analysis is not a bright-line test, but does establish parameters within which each statement or utterance may stand on its own merits rather than be subjected to a mechanistic standard. As Justice Locher, writing for the court, cautioned in *Scott*, 'the totality of the circumstances test * * * can only be used as a compass to show general direction and not a map to set rigid boundaries.' " *Vail, supra,* 72 Ohio St.3d at 282, 649 N.E.2d at 185.

▇▇▇ Lincoln argues that the specific language used in the Baden ad is not defamatory because the statement "1.5 million is 'missing,' and so is the LSD" does not accuse Robb of stealing or losing any money at all. We do not agree. By drawing an analogy with the LSD that had disappeared from Robb's possession, and which may have been stolen by one of his employees, the words unequivocally imply that the same happened to the monies addressed in the auditor's report, when that is untrue.

▇▇▇ A statement is more likely a matter of subjective opinion rather than objective fact if it lacks a plausible method of verification. *Scott, supra.* Here, the statement concerns a report prepared by the auditor and purports to describe transactions that the auditor cited. The statements are readily verifiable, and they purport to be statements of objective fact rather than a point of view that is obviously subjective.

The specific context in which the words appear is that of a political advertisement. The broader context is a statement made in a bitter election contest. Each produces a significant amount of subjective hyperbole that often employs facts to the detriment of a speaker's opponent. As a result, statements made for or against a candidate are generally greeted with a certain skepticism. Nevertheless, assertions that money is "missing" connote fact, not opinion, even in so wide-open an arena as an election campaign.

From the totality of the circumstances, we find that the statements made in the Baden ad to the effect that money is "missing" present statements of fact, not opinion. Therefore, they gain no additional protection under Section 11, Article I of the Ohio Constitution.

▇▇▇ Exercising our independent judgment, we find that the statement in the ad that money is missing from Robb's custody is a false statement that was published with actual malice because Lincoln knew that it was false, the dissembling testimony of its editor notwithstanding. Also, because the false meaning of the statements is conveyed directly by the words used in the publication, we find that the political ad was actionable as libel *per se* in this proceeding.

The first assignment of error is sustained in part and overruled in part.

Assignment of Error No. 2:

"The trial court erred in overruling appellant's motion for a directed verdict on the issue of malice and, consequently, erred in allowing the jury to consider punitive damages and in instructing the jury on punitive damages."

In deciding the first assignment of error we found that, though the trial court did not err when it denied Lincoln's motion for directed verdict with respect to the Brown news article, in our independent judgment the Brown news article is not actionable for defamation. Therefore, this assignment of error must be limited to the Baden political ad.

 Punitive damages are damages given in enhancement of compensatory damages on account of the wanton, reckless, malicious, or oppressive character of the acts complained of. *Trainor v. Deters* (1969), 22 Ohio App.2d 135, 51 O.O.2d 258, 259 N.E.2d 131. Punitive damages are those that are in the excess of the plaintiff's actual loss, which is satisfied by compensatory damages, and are allowed as a punishment to a defendant whose tort is aggravated by an evil motive. Punitive damages are available in actions for defamation where there is evidence of actual malice. *Thomas H. Maloney & Sons v. E.W. Scripps Co.* (1975), 43 Ohio App.2d 105, 72 O.O.2d 313, 334 N.E.2d 494.

 We have found that Robb's evidence was sufficient to demonstrate actual malice on the part of Lincoln with respect to its publication of the Baden political ad. Therefore, Robb was entitled to a proper jury instruction on punitive damages.

 Lincoln argues that the instruction the court gave the jury concerning Robb's punitive damages claim was defective in that it failed to state that proof of malice is required for an award and that punitive damages may be awarded only after compensatory damages are given. We agree that the court's instruction is defective in those regards. However, Lincoln failed to make a timely objection to the instruction the court gave. Therefore, any error arising therefrom, except plain error, is waived on appeal. Civ.R. 51(A). Plain error does not exist unless it can be said that but for the error, the outcome of the trial clearly would have been otherwise. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804. We find no plain error.

The second assignment of error is overruled.

Assignment of Error No. 3:

"The trial court erred in failing to properly instruct the jury as to the appropriate measure of damages in a libel per *quod* case."

Though this assignment of error is couched in terms suggesting a mistake in a jury instruction that the court gave, it is apparent from the Lincoln argument that the error presented is that the evidence of special damages was insufficient

to permit the case to go to the jury. More particularly, Lincoln argues that the trial court erred when it denied its motion for directed verdict on the issue of special damages. We shall consider the error assigned on that basis.

In order to establish liability for libel *per quod,* a plaintiff is required to prove that he has occasioned special damages as a result of the defamation alleged. *Becker v. Toulmin, supra.* Special damages are a form of compensatory damages, which are classified as either general or special. Each must be shown to have directly and proximately resulted from the tort alleged.

General damages are those which flow as a conclusion of law from the injury suffered. They are presumed by the injury and need not be pleaded or proved. The pain and suffering occasioned by a broken limb are an example.

Special damages are those occasioned by the special character, condition, or circumstance of the person wronged. They are not presumed by the injury. They must be specially pleaded and must be proved by competent evidence.

Robb pleaded in his complaint that he was damaged generally by a loss of reputation and specially by loss of the election to Baden, each as a direct and proximate result of the defamation alleged. The jury found that Robb was defamed and that the defamation resulted from the tort of libel *per quod,* with respect to both the Hamilton Journal News article and the Baden political ad. The jury awarded Robb $15,000 in general damages and $85,000 in special damages for each of those two libelous publications by Lincoln.

Lincoln argues that the evidence was insufficient as a matter of law to prove the special damages that Robb alleged, loss of the election which occasioned the resulting pecuniary loss of the salary and benefits. We do not agree.

Both Robb and Fox testified that Lincoln's defamatory publications cost Robb the election. Tuchfarber offered testimony from which one could reasonably infer that Robb, a twenty-four-year Republican incumbent in a solidly Republican county, who had always defeated his opponents, would not have lost an election to a Democratic challenger but for the libel published by Lincoln. Tuchfarber correlated the abrupt decline in Robb's support with the locales in Butler County where the Hamilton Journal News circulates.

The foregoing evidence is sufficient to demonstrate that Robb lost the election as a proximate result of the Lincoln's libelous publications. Therefore, the trial court did not err when it denied Lincoln's motion for directed verdict, and Robb was entitled to a jury instruction on his special damages claim. Unfortunately for Robb, the jury cannot fairly be said to have determined that the ad alone cost Robb the election; the record demonstrates that the loss proximately resulted from the Baden ad and the Brown news article, together.

Because we have found that the Brown news article is not actionable by Robb, the special damage awards for both publications must be vacated. The $15,000 general damage award for the Baden ad need not be vacated, however, because it was not based on that evidence.

Robb was also awarded punitive damages in the amount of $300,000 on both publications, jointly. Because we have found that the Brown news article is not actionable by Robb, the entire punitive damage award must also be vacated.

In response to this assignment of error Robb states, by way of his own assignment of error per R.C. 2505.22, that the trial court erred when it limited his claim for relief to a libel *per quod* theory. Having found that the statements in the Baden ad are libel *per se,* we agree. The only relief that we can offer Robb on that error, however, is to remand for further proceedings on his libel *per se* claim. He is not entitled to retry his claim for general damages because we have affirmed the judgment awarding him $15,000 on that claim. However, Robb is entitled to seek relief on his special damages claim, that publication of the political ad proximately caused him to lose the election. Together with that, or even if he elects not to pursue it, Robb may also seek an award of punitive damages for publication of the ad.

The third assignment of error is overruled.

Assignment of Error No. 4:

"The trial court erred in failing to instruct the jury on the protection afforded by the First Amendment to the Ohio and U.S. Constitutions."

Lincoln argues that the trial court should have instructed the jury regarding the freedom of speech and freedom of the press protections of the First Amendment to the Constitution of the United States and Section 11, Article I of the Ohio Constitution. This contention lacks merit.

The function of the jury, as trier of fact, is to make findings of fact determinative of any claim for relief or defense to it. The purpose of jury instructions is to properly guide the jury in performing that task. The constitutional protections afforded the rights of freedom of speech and freedom of the press present no issues of fact for determination by the jury. Therefore, the court was not required to instruct the jury on those constitutional provisions or the protections they afford. The court properly declined to give an instruction that Lincoln requested, the text of which merely argued the force and purpose of these constitutional protections without presenting any question of fact for the jury to decide.

Lincoln also argues that the trial court should have asked the jury to determine whether the assertions in the news article and the Baden political ad

concerning "missing money" are statements of fact or statements of opinion. That is a question of law to be decided by the court. *Scott v. News–Herald, supra.* Therefore, a jury instruction on that issue would have been improper.

The fourth assignment of error is overruled.

Assignment of Error No. 5:

"The trial court erred to the prejudice of appellant by overruling objections to comments of appellee's counsel on summation."

Assignment of Error No. 6:

"The trial court erred in failing to sign an entry of dismissal after having dismissed the case on the record."

Assignment of Error No. 7:

"The trial court erred to appellant's prejudice in allowing Ed Robb and Michael Fox to testify as to out of court conversations because such statements are inadmissible hearsay."

Assignment of Error No. 8:

"The trial court abused its discretion in limiting cross examination in this case."

The fifth through eighth assignments of error present issues that are rendered moot by our ruling sustaining the third assignment of error. Therefore, exercising the discretion we are granted by App.R. 12(A)(1)(c), we decline to address those other assignments.

Having found that the Brown news article published by Lincoln is not actionable on a claim of defamation brought by Robb, we vacate the judgments for Robb entered on his defamation claim with respect to that publication, which include a compensatory damage award of $100,000 and the entire punitive damage award of $300,000.

Having found that the Baden political ad published by Lincoln is actionable on a claim of defamation as libel *per se,* we affirm the $15,000 general damages award for Robb on his defamation claim with respect to that publication, but we vacate the $85,000 award of special damages for that publication for the reasons we have stated. The cause is remanded for further proceedings on Robb's claims for special and/or punitive damages arising from that publication.

*Judgment accordingly.*

BROGAN, P.J., and FAIN, J., concur.

JAMES A. BROGAN, P.J., MIKE FAIN and THOMAS J. GRADY, JJ., of the Second Appellate District, sitting by assignment.