EARLY et al., Appellants,

v.

THE TOLEDO BLADE, Appellee.

[Cite as *Early v. The Toledo Blade* (1998), 130 Ohio App.3d 302.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–97–1286.

Decided Oct. 9, 1998.

310

*George C. Rogers* and *James D. Godbey,* for appellants.

*Fritz Byers,* for appellee.

HANDWORK, Presiding Judge.

This is an appeal from a July 9, 1997 opinion and judgment entry of the Lucas County Court of Common Pleas, in which the court granted summary judgment to appellee, the Toledo Blade ("the Blade"), on claims for invasion of privacy and defamation brought by appellants. Appellants are ten individuals [1] who were named in articles from a special series titled "The Secret Files of Internal

---

1. The names of the ten appellants are Michael Dennis Early, George J. Taylor, Jr., Robert R. Case, John P. Smith, Robert L. Barboza, Kimberly L. Kristoff, Martin Schaber, Mary Ann Hodak, Linda Leichty, and Jane Lewis. Two plaintiffs in the trial court, Edwin and Pamela Marok, chose not to appeal.

Affairs" that was published by the Blade from June 24, 1990 to July 1, 1990. The articles in the series revealed information reporters working for the Blade learned primarily from a review of the internal affairs files of the Toledo Police Division.

Appellants have presented five assignments of error for consideration on appeal:

"Assignment No. 1

"The trial court erred in failing to accept as true for summary judgment purpose all the evidence and inferences in favor of the plaintiffs and erred in apparently weighing the evidence.

"Assignment No. 2

"The trial court erred by excluding the testimony of plaintiffs' linguistic expert, P.K. Saha, and plaintiffs' journalism expert, David Jamison.

"Assignment No. 3

"The trial court erred in granting summary judgment dismissing the defamation claims of plaintiff police officers Hodak (Rose), J.P. Smith, Taylor, Case, Schaber, Barboza, Early.

"Assignment No. 4

"The trial court erred in granting summary judgment dismissing the invasion privacy [sic] claims of Kristoff, Lewis and Leighty.

"Assignment of No. 5

"The trial court erred in awarding discovery sanctions for conduct occurring prior to the court notifying counsel that it was not going to require defendant to comply with the civil rules and local civil rules pertaining to discovery and the Court did not incorporate the sanctions order in its final judgment."

We will first consider the arguments relating to the fifth assignment of error.

In support of their fifth assignment of error, appellants contend that their trial counsel should not have been sanctioned for discovery violations. Appellants argue that the trial court (1) should have given advance notice that it was going to grant the Blade leave of court to propound more than thirty-five interrogatories before it sanctioned their trial counsel for not filing responses to the interrogatories, (2) should have given them notice that it was not going to require the Blade to provide at least one inch of space between interrogatories for appellants to provide answers before it sanctioned their trial counsel for referring responses to another document, and (3) should have given them credit for good faith because they offered an "open file" discovery to the Blade.

■ The Supreme Court of Ohio has ruled that an appellate court can reverse a discovery sanction only if the trial court abused its discretion when it imposed the sanction. *Nakoff v. Fairview Gen. Hosp.* (1996), 75 Ohio St.3d 254, 662 N.E.2d 1, syllabus. The Supreme Court said in its opinion:

"In order to have an abuse of that choice, the result must be so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias." *Id.* at 256, 662 N.E.2d at 3.

Civ.R. 37(A) governs sanctions for discovery violations and provides:

"(A) Motion for Order Compelling Discovery. Upon reasonable notice to other parties and all persons affected thereby, a party may move for an order compelling discovery as follows:

" * * *

"(2) *Motion.* If a * * * party fails to answer an interrogatory submitted under Rule 33, * * * the discovering party may move for an order compelling an answer or an order compelling inspection in accordance with the request. * * *

"(3) *Evasive or Incomplete Answer.* For purposes of this subdivision an evasive or incomplete answer is a failure to answer.

"(4) *Award of Expenses of Motion.* If the motion is granted, the court shall, after opportunity for hearing, require the party or deponent who opposed the motion or the party or attorney advising such conduct or both of them to pay the moving party the reasonable expenses incurred in obtaining the order, including attorney's fees, unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust."

■ Keeping these standards in mind, we now turn to the facts and procedure that led to the trial court imposing sanctions upon appellants' trial counsel. A chart showing the events that led to the trial court's ruling follows:

February 19, 1991—The Blade serves interrogatories on the appellants named as plaintiffs in the first complaint.

March 19, 1991—The responses are due. Appellants' counsel told counsel for the Blade, in the presence of the trial court, that answers would be given within one week. No answers were provided at the promised time. Two other deadlines passed with no answers.

April 8, 1991—Appellants file what the trial court calls "responses of a sort." Many questions were answered by referring the Blade to a document prepared

by plaintiffs' counsel in which all of the plaintiffs' claims were summarized. The document was titled "Falsehoods and Actual Malice Summary."

May 16, 1991—The Blade's counsel sent appellants' counsel a letter explaining why it believed the responses were inadequate.

June 28, 1991—Appellants' counsel sent a return letter that the trial court said "addressed in vague terms some of the issues raised by The Blade in its letter, and offered no resolution, unless defendant was willing to capitulate to the plaintiffs' views of the proper uses of various kinds of discovery."

July 15, 1991—The Blade's counsel sent another letter to appellants' counsel to try to resolve the problem informally. The Blade receives answers to interrogatories from three of four new plaintiffs who were added to the case by amended complaint. The answers mirror those provided earlier by the original plaintiffs.

August 14, 1991—The Blade receives answers from the fourth new plaintiff, thirty days after a voluntary enlargement of time to respond had expired.

August 21, 1991—Appellants' counsel send a letter to counsel for the Blade that says: "I am just about fed up with the epithets, whining and and [sic] false statements contained in your letters. It is unprofessional. If you think that you have some basis to complain about my discovery or cooperation you should seek your remedy in Court. I have as politely as possible repeatedly made our position as clear as possible."

August 27, 1991—The Blade files a motion to compel appellants to respond fully to the Blade's first sets of interrogatories.

Sept. 3, 1991—Trial court grants a request from the Blade to file additional interrogatories on two plaintiffs (Edwin and Pam Marok).

Sept. 16, 1991—Appellants file a memorandum in opposition to the motion to compel.

Sept. 27, 1991—Oral hearing held on the motion to compel.

Dec. 23, 1991—The Blade files a second motion to compel because no responses were filed to the additional interrogatories served, with leave of court, on Edwin and Pam Marok.

March 2, 1992—The trial court grants the motions to compel. It gives appellants' counsel ten days to "show that their opposition to defendant's discovery and motions to compel was substantially justified or that other circumstances make an award of damages unjust."

March 20, 1992—Appellants file a memorandum, with leave of court, arguing that sanctions are not warranted.

March 25, 1992—The Blade files a response to the memorandum.

April 3, 1992—The trial court rules that sanctions are warranted and requests proof of fees and costs from the Blade.

April 9, 1992—The Blade files proof of fees and costs.

April 17, 1992—The trial court orders appellants' trial counsel to pay $18,981.50 of fees and costs to the Blade as a sanction for discovery violations.

We have carefully reviewed the record, and conclude for the following reasons that the trial court did not abuse its discretion when it imposed sanctions upon appellants' trial counsel. First, the trial court had no obligation to inform appellants' trial counsel that it would allow the Blade to serve more than thirty-five interrogatories on each appellant. As the trial court noted in its March 2, 1992 opinion, appellants' trial counsel agreed to waive limits on the number of interrogatories served. Accordingly, the Blade did not need leave of court to serve additional interrogatories on appellants.

If appellants' trial counsel later thought the Blade took unfair advantage of the agreement, they could have sought relief. Instead, the record shows they chose repeatedly to tell the trial court and counsel for the Blade that they would give answers by a certain date. Each time, the agreed-upon date came and went with no answers provided by appellants.

Second, this court is unpersuaded by the argument that the failure of the Blade to provide at least one inch of space for each answer freed appellants from the obligation to provide separate answers to each interrogatory. As the trial court noted, by filing untimely answers, appellants waived the right to raise objections to the interrogatories.

In addition, even if the failure to provide adequate space was objectionable, appellants' counsel again could have sought a remedy from the trial court, or could have filed timely answers noting their objection. Instead, they chose to violate the rules themselves by filing untimely answers for their clients, and by failing to ensure that separate answers were provided by their clients to each inquiry. The answers provided to specific interrogatories posed to specific appellants that merely referred to a document compiled by appellants' counsel that related to all of the clients' claims were evasive and, therefore, incomplete answers pursuant to Civ.R. 37.

Third, the trial court had no obligation to give appellants' counsel credit for good faith just because they offered an "open file" discovery to counsel for the Blade. In a case with so many plaintiffs and so many separate claims, an "open file" offer could be meaningless, as the recipient of the offer would have to expend a great deal more time and energy than would the party making the offer, in order to learn the answers to its questions. The trial court was in the best

position to judge whether appellants' counsel were acting in good faith and was not unjustified in concluding that they were not.

We note that the trial court in this case gave appellants' counsel ample opportunity to avoid sanctions. The trial judge first urged the parties to reach an amicable resolution to the dispute. When the parties could not reach an amicable resolution, the trial judge held an oral hearing on the motion to compel in which both parties had full opportunity to argue their positions. When the trial court filed a judgment entry granting the motion, it specifically gave appellants' counsel ten days to file written arguments regarding why sanctions should not be granted in this case. The trial court also had the Blade submit proof of actual fees and costs before the final amount was set at $18,981.50 to be paid by plaintiffs' counsel with no contribution from outside sources, including their clients.

Finally, the sanction order was incorporated into the trial court's final opinion and judgment entry. The trial court noted that it had imposed the sanction in an earlier judgment entry and said, "Parenthetically, it is noted that payment of this fine was due on or before June 1, 1992 and * * * it has not been paid as of this writing. For the record, the appropriateness of that earlier fine is emphatically reiterated * * *." Accordingly, appellants' fifth assignment of error is not well taken.

In support of their second assignment of error, appellants argue that the trial court erred when it excluded the testimony of two of their experts, Prosanta K. Saha and David Jamison. Appellants state, "In cases such as these dealing with defamation constructed from 'loaded words,' 'juxtaposition and sequence of idea' and repetition of phrases, a linguistics expert can assist jurors, some of whom may not have strong English backgrounds."

The record shows that Prosanta K. Saha is an Associate Professor of Linguistics and Literature at Case Western Reserve University and is a consultant for Webster's New World Dictionary. He has testified in several cases as a linguistics expert and has testified in one other defamation case.

David Jamison is a Professor of Communications at the University of Akron and is a licensed attorney in the state of Ohio. He previously testified in other cases as a journalism expert.

On January 11, 1993, the Blade filed a motion to strike the testimony, reports and affidavits of the two witnesses in question. The Blade argued six bases in support of its motion to strike:

"(1) neither of these witnesses qualifies as an expert as required under Evid. R. 702, (2) Saha's testimony, and to a large extent that of Jamison, is irrelevant and improper because it addresses a matter of law reserved for the Court—

whether the articles are susceptible of a defamatory construction, (3) their testimony would not meet the mandate of Rule 702 that expert testimony 'assist the trier of fact' because a jury would not require expert assistance to evaluate the content and import of the straightforward, nontechnical articles at issue and because the testimony of neither expert is relevant to the 'actual malice' inquiry, (4) the opinion testimony of both Saha and Jamison is inadmissible under Evid. R. 703 and 705 because plaintiffs' counsel presented Saha and Jamison with inaccurate and incomplete versions of the facts known to the reporters at the time the articles were written and published, (5) because their testimony would not assist the trier of fact and is based on incomplete or inaccurate information, the testimony of these two witnesses is irrelevant and, therefore, inadmissible under Evid. R. 402, and (6) even if their testimony were relevant, it must be stricken under Evid. R. 403 on the grounds that it confuses the issues and is likely to mislead the trier of fact."

Appellants filed a memo in opposition to the motion to strike, and the Blade filed a reply to the memo.

On February 23, 1993, the trial court filed a judgment entry in which it said:

"The defendants have filed their Motion to Strike the Testimony, Reports, and Affidavits of Plaintiffs' Experts, Prosanta K. Saha and David L. Jamison. The Court has reviewed the Motion and finds it well taken. Accordingly, it is

"ORDERED that the Testimony, Report, and Affidavit of Plaintiffs' Expert, Prosanta K. Saha, be, and it hereby is, stricken from record of this case. It is further

"ORDERED that the Testimony, Report, and Affidavit of Plaintiffs' Expert, David L. Jamison be, and it hereby is, stricken from record of this case."

The Blade filed a motion to supplement the record on appeal with a transcript of the trial court's February 23, 1993 oral ruling. We granted the motion on February 9, 1998. The content of the transcript shows that the trial judge orally explained the basis of his ruling granting the motion to strike. In his remarks, the trial judge indicated that neither of the witnesses in question would qualify as an expert pursuant to Evid.R. 702. He also indicated that even if the witnesses could qualify as experts, their opinions were unreliable because they had not been provided with a fair cross section of the record. Finally, he indicated that the opinions presented by the witnesses on ultimate issues of law, such as whether a statement is defamatory, were not needed, as he was able to make those rulings himself.[2]

---

2. The trial court later quoted portions of its remarks in a footnote of its opinion and judgment entry in which it granted summary judgment to the Blade.

A trial court's ruling granting or denying a motion to strike will be reversed by an appellate court only for an abuse of discretion. *Riley v. Langer* (1994), 95 Ohio App.3d 151, 157, 642 N.E.2d 1, 4–5. Likewise, a trial court's "ruling concerning the admission of expert testimony is within the broad discretion of the trial court and will not be disturbed absent an abuse of discretion." *Scott v. Yates* (1994), 71 Ohio St.3d 219, 221, 643 N.E.2d 105, 107.

The Supreme Court of Ohio has noted that a trial court is empowered, pursuant to Evid.R. 104(A), to make a "threshold determination" concerning an expert witness's qualifications to testify. *Id.* Our review of the record shows that the trial court did not abuse its discretion when it ruled that neither of appellants' witnesses qualified as experts.

At the beginning of the depositions for both witnesses,[3] counsel for the Blade asked for a clarification of the areas appellants expected the court to accept as the areas of expertise for each witness. Regarding Professor Saha, appellants' counsel replied, "Psycholinguistics, meaning of words and the impact those words have on the listener." Regarding Professor Jamison, appellants' counsel said:

"Well we intend to offer Mr. Jamison as an expert in the field of journalism and the propriety of journalistic writing and whether or not the undertaking of Messrs. Murray and Roe and The Toledo Blade Company were within the appropriate standards of journalistic ethics and whether or not the writing reaches the level of intentional falsehood or reckless disregard of the truth."

Professor Saha acknowledged repeatedly that psycholinguistics is an emerging area of study that is not yet fully accepted as valid by fellow linguists. He and Professor Jamison both acknowledged that they had never studied journalism, did not teach journalism, and were not themselves journalists. The trial court did not err in concluding that neither witness was qualified as an expert in the areas for which they were offered by appellants.

In addition, the record shows that the trial court was correct when it concluded that even if the professors were qualified experts, their opinions were unreliable because they were not provided with adequate records to study. Neither witness had seen the actual internal affairs files used by the reporters.

---

3. The depositions included in the record for these two individuals, and for several other witnesses, were not properly filed, pursuant to Civ.R. 30. However, the trial court clearly considered the depositions in question, and no objection was raised in that court or in this court regarding the use of the depositions. Because they have been included in the record on appeal, and because neither party has raised any objection regarding their inclusion, we will consider the contents of the depositions. See, *e.g., Bowmer v. Dettelbach* (1996), 109 Ohio App.3d 680, 684, 672 N.E.2d 1081, 1084; *Boydston v. Norfolk S. Corp.* (1991), 73 Ohio App.3d 727, 731, 598 N.E.2d 171, 173, fn. 2; and *Gaumont v. Emery Air Freight Corp.* (1989), 61 Ohio App.3d 277, 287, 572 N.E.2d 747, 753–754.

Professor Saha was provided with photocopies of single articles, rather than with the actual newspapers where the articles appeared. As a result, he had mistaken impressions regarding the placement of some articles and headlines—information he relied upon in opining that false or defamatory impressions were created in the minds of the average readers of the articles.

Finally, we agree with the trial court that an expert witness should not be allowed to testify about his or her interpretation of the law, "as that is within the sole province of the court." *Wagenheim v. Alexander Grant & Co.* (1983), 19 Ohio App.3d 7, 19, 19 OBR 71, 84, 482 N.E.2d 955, 969. The question of whether a publication is defamatory, *Yeager v. Local Union 20* (1983), 6 Ohio St.3d 369, 372, 6 OBR 421, 423–424, 453 N.E.2d 666, 669–670, or is published with actual malice, *Harte–Hanks Communications, Inc. v. Connaughton* (1989), 491 U.S. 657, 685, 109 S.Ct. 2678, 2694–2695, 105 L.Ed.2d 562, 587, is a question of law. The trial court did not abuse its discretion when it excluded the testimony of the witnesses in question. Appellants' second assignment of error is not well taken.

The remaining three assignments of error presented by appellants all relate to whether the trial court erred when it granted the Blade a summary judgment on appellants' claims for defamation and/or invasion of privacy. When deciding whether a summary judgment is warranted, all Ohio courts are governed by the provisions of Civ.R. 56(C), which state:

"Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence in the pending case, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor."

Keeping this standard in mind, we have carefully reviewed the record and have considered the arguments presented by the parties.

In the text of their first assignment of error, appellants allege that the trial court failed to accept all their evidence as true and failed to draw inferences in their favor as required by Civ.R. 56. However, the argument they present in their brief in support of this assignment of error fails to give any examples of when the trial court failed to accept their evidence as true or failed to draw

inferences in their favor. Instead, they state that the Blade "argued below that a plaintiff in a defamation action should bear a special burden of defeating a motion for summary judgment to prevent a possible chilling effect on the freedom of expressions. The U.S. Supreme Court has rejected this suggestion." Appellants then cite and discuss two cases they represent as supporting their contention that no greater burden is placed on a party opposing summary judgment in a defamation case than is placed on a party opposing summary judgment in any type of case.

App.R. 12(A)(2) provides:

"The court may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A)."

Appellants failed to identify in the record the error on which their assignment of error is based. Appellants' general statements about the standard for summary judgment in a defamation case are of little benefit when they are not accompanied with a discussion of how the trial court allegedly strayed from imposing the correct burden on appellants when it granted·summary judgment in this case. Because appellants have not sufficiently identified any basis in the record to support the allegation they make in their first assignment of error, we will disregard this assignment of error. Appellants' first assignment of error is not well taken.

In support of their third assignment of error, seven appellants argue that the trial court erred when it granted the Blade summary judgment on their defamation claims. The arguments relating to each of the seven appellants will be considered separately. However, the law that applies to each of the claims in question is the same. Accordingly, before we separately review the facts of the individual claims for defamation, we begin by reviewing the rules of law relating to a defamation claim.

 Ohio courts have repeatedly defined defamation as "a false and *malicious publication against an individual made with an intent to injure his reputation or to expose him to public hatred, contempt, ridicule, shame, or disgrace or to affect him injuriously in his trade, business or profession. It is defamatory, and actionable at law, if as a proximate consequence of the libel the individual against whom it is published occasions a pecuniary loss."* *Robb v. Lincoln Publishing (Ohio), Inc.* (1996), 114 Ohio App.3d 595, 616, 683 N.E.2d 823, 837.

 A court must decide as a matter of law whether a statement is defamatory. *Yeager,* 6 Ohio St.3d at 372, 6 OBR at 423–424, 453 N.E.2d at 669–

670. When making this legal determination, the trial court must "review the statement under the totality of the circumstances." *Mendise v. Plain Dealer Publishing Co.* (1990), 69 Ohio App.3d 721, 726, 591 N.E.2d 789, 792. The trial court must read the statements at issue "in the context of the entire article" in order to determine "whether a reader would interpret them as defamatory." *Id.* at 726, 591 N.E.2d at 792.

When a defamatory statement is made about a public official, the public official must prove an additional element by clear and convincing evidence. The additional element that the public official must prove is that the publisher of the defamatory statement acted with actual malice. *Waterson v. Cleveland State Univ.* (1994), 93 Ohio App.3d 792, 797, 639 N.E.2d 1236, 1239, citing *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789. To prove that a party acted with actual malice, the plaintiff must show that the party who published the defamatory statement did so "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 279–280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686, 706. Further, the United States Supreme Court has stated, "The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law." *Harte–Hanks Communications*, 491 U.S. at 685, 109 S.Ct. at 2694, 105 L.Ed.2d at 587.

The Supreme Court of Ohio has noted, "The United States Supreme Court has repeatedly recognized that police officers are public officials." *Soke v. Plain Dealer* (1994), 69 Ohio St.3d 395, 397, 632 N.E.2d 1282, 1284. In addition, the Supreme Court of Ohio has noted that the United States Supreme Court has ruled that "the Constitution protects statements made about public officials when those statements concern 'anything which might touch on an official's fitness for office * * *.' " *Id.* at 397, 632 N.E.2d at 1284, quoting *Garrison v. Louisiana* (1964), 379 U.S. 64, 77, 85 S.Ct. 209, 217, 13 L.Ed.2d 125, 134. No dispute exists in this case that the rules relating to public officials in a defamation case are applicable to appellants. Each of the appellants who assert they were defamed are police officers, and the articles published about them related to their performance on the job or to their fitness for duty.

Ohio also recognizes defenses to a claim for defamation. One recognized defense is the "innocent construction rule." Under this rule, "if allegedly defamatory words are susceptible to two meanings, one defamatory and one innocent, the defamatory meaning should be rejected, and the innocent meaning adopted." *Yeager*, 6 Ohio St.3d at 372, 6 OBR at 423, 453 N.E.2d at 669.

A second defense is a claim for a statutory privilege for reporting summaries of official records. A party claiming this defense will win if it

demonstrates that the report was "substantially accurate." *Oney v. Allen* (1988), 39 Ohio St.3d 103, 529 N.E.2d 471, paragraph two of the syllabus. A report is substantially accurate "if it conveys the essence of the official record to the ordinary reader, without misleading the reader by the inclusion of inaccurate extra-record information or the exclusion of relevant information in the record." *Id.* at paragraph three of the syllabus. A trial court can grant summary judgment if it concludes that the innocent-construction rule applies to allegedly defamatory statements. See *Mendise,* 69 Ohio App.3d at 726, 591 N.E.2d at 792.

Finally, a defendant who can prove the truth of the allegedly defamatory statement has an absolute defense. *Shifflet v. Thomson Newspapers (Ohio), Inc.* (1982), 69 Ohio St.2d 179, 183, 23 O.O.3d 205, 207–208, 431 N.E.2d 1014, 1017. When a defendant is able to demonstrate the truth of the allegedly defamatory statement, summary judgment can properly be granted. *Strickland v. Tower City Mgt. Corp.* (Dec. 24, 1997), Cuyahoga App. No. 71839, unreported, 1997 WL 793133. Keeping all these standards in mind, we now turn to the individual claims for defamation presented by appellants.

Appellant Mary Ann Hodak claims that she was defamed by the Blade by two statements in a June 24, 1990 article and by the headlines, a photograph and several statements in a June 28, 1990 article. Appellant Hodak argues that specific statements in the articles in question, along with headlines, pictures, captions, and key findings highlighted in a box near the second article created defamatory implications relating to her. She argues that a reasonable reader would conclude that she was guilty of neglect of duty and that she had made bad decisions. She argues that those implications are false, and that she provided clear and convincing evidence that the Blade published the statements with a high degree of awareness that they were probably false. She argues that she provided proof that the Blade acted with actual malice when it published the statements.

The June 24, 1990 article was an editorial opinion piece that was published in a different section of the paper than the actual series of investigative reports. The article described the genesis of the project and contained two statements that many appellants assert defamed them.

The two statements in question were:

(1) "The most challenging aspect of this series is its subject matter: brutality, sexual attacks, child molestation, misjudgments that ended in death, drug and alcohol abuse by public servants, misplaced values, and the corruption of systems meant to protect us." John Nichols, 'Secret Files' became 7–month exploration of police misconduct, The Blade, June 24, 1990, at E5;

(2) "Roe adds 'We pared it down to cases that seemed to affect the community—alcohol cases where officers were carrying guns, repeated brutality offenders, domestic violence cases that turned into public brawls, neglect of duty cases.' " *Id.*

Appellant Hodak contends that the reference in the first statement to misjudgments that ended in death and the reference in the second statement to neglect of duty defamed her.

We agree with the trial court that these two statements do not constitute defamation of appellant Hodak. The statements are not "of and concerning" any one individual. In addition, the statements were part of an editorial article. As the Supreme Court of Ohio has noted, " '[d]ifferent types of writing have * * * widely varying social conventions which signal to the reader the likelihood of a statement's being either fact or opinion.' " *Scott v. News–Herald* (1986), 25 Ohio St.3d 243, 253, 25 OBR 302, 311, 496 N.E.2d 699, 708, quoting *Ollman v. Evans* (C.A.D.C.1984), 750 F.2d 970, 979. Finally, because the article was published several days before any article referring to appellant Hodak appeared, and because the statements do not refer to any one individual, we agree with the trial court that the reasonable reader would not make any connection between these statements and appellant Hodak.

■ We next consider the second article that appellant argues contained defamatory implications. The June 28, 1990 article, titled "Errors of judgment that end in tragedy," reported the events that led to the death of David Plenzler and appellant Hodak's part in those events. The article began on the front page of the paper and continued on page six. Just above the article's headline was a picture of David's dead body with the caption "Body of stabbing victim David Plenzler, morning after police were called to his home." The following facts were reported in the article.

A downstairs neighbor called the Toledo Police to report fighting in the upstairs apartment, and that "the guy" (who turned out to be David) kept saying, "You killed me!" The officer who took the call did not think it was an emergency, so no police units were sent to the scene for the next six minutes.

When appellant Hodak, her partner, and a rookie trainee, were sent to the scene, they were told the complaint was "disorderly-conduct/men fighting," so "they did not suspect that someone inside had been seriously hurt." Dave Murray and Sam Roe, "Errors of judgment that end in tragedy," The Blade, June 28, 1990, at 6. Appellant Hodak, her partner and the rookie trainee all went into the apartment, where they saw David lying on his side on the living room floor. His wife said he had been fighting at a bar, and that he was drunk. Appellant Hodak and her partner both saw two spots of blood on the floor.

When appellant Hodak's partner kicked David's foot, he raised his head and then lowered it in response. Appellant Hodak knelt down by David's head. She heard snoring and smelled alcohol on his breath. The investigation ended there, and the officers left. They had been at the apartment for six minutes.

The next morning, a relative discovered that David was dead. His body was discovered on the living room floor. Underneath his body was a large blood stain and a serrated steak knife. His wife was arrested for his murder. She pleaded guilty to involuntary manslaughter. She received a sentence of three to ten years in prison.

Internal affairs did an investigation and concluded that "the officers involved had not done their jobs properly." *Id.* Chief of Police Marti Felker suspended appellant Hodak and her partner for ten days for neglect of duty. The suspension order was overturned by the Toledo Civil Service Commission.

The Blade quoted Chief Marti Felker as saying that he ordered the ten-day suspension of the officers after deciding that the way they handled the call constituted neglect of duty. However, he did not believe that their neglect of duty was the direct cause of David's death. The Blade then quoted David's mother, who said she did not agree with that conclusion. She felt that the officers should have been punished. She said her son was not snoring, he was gurgling death.

The Blade also quoted remarks made by the chairman of the Toledo Civil Service Commission when the commission held a hearing on the officers' appeal from their suspensions. The commission chairman said that the officers' examination of David could be considered "cursory" and that further examination might have been in order. Nevertheless, the Blade reported, the commission unanimously dismissed the charges after ruling that there was not enough evidence at the scene to alert the officers that a crime had just been committed. The Blade further reported that appellant Hodak and the other officers involved in the case had declined comment.

Appellant Hodak does not dispute any of the facts recounted. Instead, appellant Hodak takes issue with how some of the facts were reported. For instance, she lists several statements she objects to, which are (1) "A subsequent Internal Affairs investigation concluded that the officers involved had not done their jobs properly," *id.* at 1; (2) "Indeed, when it comes to police work, neglect of duty can be fatal." *Id.;* (3) "Or, in the death of Mr. Plenzler, a police operator doesn't recognize a potential emergency, and two officers fail to discover a man has been mortally stabbed," *id.*; (4) "The death of David Plenzler involved several officers making several bad decisions, but sometimes all it takes is one cop making one bad decision for someone to die," *id.* at 6; and (5) "The next

morning, on March 2, 1988, a relative discovered Mr. Plenzler's body, still on the living room floor, the carpet underneath caked with dried blood," *id.* at 1.

We have reviewed the entire article, the surrounding headlines, pictures, captions and graphics, and agree with the trial court that none of these statements, when viewed in context, constitute defamation. As the trial court stated, "a thorough and reasonable reading of the article does not convey the impression that Ms. Hodak, by neglecting her duties as a police officer, caused Mr. Plenzler's death." Indeed, as we previously noted, the article contained the information that she was cleared of neglect-of-duty charges, and that the Chief of Police and the chairman of the Toledo Civil Service Commission both said that the actions of the officers did not cause David's death.

We further find that the statements are not defamatory for these additional reasons. Several of the statements that appellant Hodak complains of are truthful. Internal affairs did conclude that the officers had not done their jobs properly, because it charged them with neglect of duty. The statement that neglect of duty by a police officer can be fatal is a true statement. The statement that two police officers failed to discover that David was fatally stabbed is also true. One statement, that several officers made bad decisions in David's case, is a protected statement of opinion. See *Vail v. Plain Dealer Publishing Co.* (1995), 72 Ohio St.3d 279, 283, 649 N.E.2d 182, 186; *Scott v. News–Herald*, 25 Ohio St.3d at 250, 25 OBR at 307–308, 496 N.E.2d at 705–706 (court can determine as a matter of law that a statement is opinion, not fact, and is not defamatory). As the trial court noted, while appellant Hodak and her partner were cleared of neglect-of-duty charges, persons could still legitimately form an opinion that they made some bad choices in how they handled the call. Finally, it is a true statement that David's body was still on the living room floor when it was found.

Therefore, we agree with the conclusions of the trial court that these statements were not defamatory, that there is no proof that the statements were published with actual malice, that the statements taken from public records are substantially accurate, and that the statements in the photo caption qualify for the innocent-construction rule. The trial court did not err when it granted the Blade a summary judgment on appellant Hodak's claim for defamation.

Appellant George Taylor argues that the Blade defamed him in the June 24, 1990 opinion editorial article and in headlines, statements and pictures relating to three June 25, 1990 articles. The June 24, 1990 opinion editorial article is the same one complained of by appellant Hodak. The two statements complained of by appellant Taylor are:

(1) "Roe adds 'We pared it down to cases that seemed to affect the community—alcohol cases where officers were carrying guns, repeated brutality offenders, domestic violence cases that turned into public brawls, neglect of duty cases.'" John Nichols, 'Secret Files' became 7–month exploration of police misconduct, The Blade, June 24, 1990, at E5;

(2) "Once they had done this, the pair set out to recreate key incidents, talking with persons associated with those cases: the officers, their commanders, victims, and bystanders." *Id.*

Once again, we agree with the trial court that because these statements are not "of and concerning" any one individual, they are not defamatory. Even though appellant Taylor showed that the reporters in question never talked with him to prepare their stories, no defamation exists in their saying that officers and their commanders were contacted in preparation for this series, as the record shows that the reporters did talk with several officers and commanders.

We now turn to the June 25, 1990 articles. The first article, which was on the front page of the paper, was entitled "Police Violence: a costly, recurring problem for city." A thorough reading of the article shows that it never refers to appellant Taylor. The second article, which appeared on pages six and seven of the front section of the paper was titled "Brutality? You Decide: A costly, recurring, and painful problem." Again, a thorough reading of the article reveals no reference to appellant Taylor. The third article appeared on page seven in a shaded box at the bottom of the page titled "Other key cases." The title of the third article was "Role reversal: A repeat victim." A picture of appellant Taylor and of two x-rays showing the broken arm of Campbell Reasonover accompanied the article.

The article contained the following information. Campbell Reasonover "was repeatedly beaten up by cops." Role reversal: A repeat victim, The Blade, June 25, 1990, at 7. In the first incident, Reasonover resisted three officers who arrived at his house to arrest him on an outstanding warrant. He said that the officers beat him with their nightsticks, and he had to get forty-four stitches in his head.

A second incident occurred five years later. Reasonover told officers who were investigating an incident to get out of his yard. He then went back into his house after exchanging words. According to the Blade:

"A steamed Officer George Taylor, Jr., kicked in the back door, cutting his leg, and grabbed Mr. Reasonover in the kitchen.

"The officer twisted Mr. Reasonover's arm behind his back, slipping his nightstick between the man's arm and back. Using it as a lever, he pushed and pushed.

"Then *snap*. Mr. Reasonover's arm broke. And no wonder. At the time, Mr. Reasonover was 67 years old. He sued the city, settling out of court for $25,000.

"Mr. Reasonover did not complain to Internal Affairs, so Officer Taylor, a second-year veteran, was never investigated. He is still a Toledo police officer." *Id.*

Appellant Taylor complains about the use of the term "steamed" to describe his demeanor when he entered Reasonover's house. He says that the Blade knew this was a false characterization. He also contends that he did not break Reasonover's arm; his female partner did. He says that the Blade had "no document or eyewitness that identified [him] as the person breaking Mr. Reasonover's arm."

 The documents in the record, including depositions and trial testimony from the lawsuit Reasonover filed after his arm was broken, show that two different versions did exist regarding who was responsible for breaking Reasonover's arm. Appellant Taylor and his partner both testified that she broke Reasonover's arm. In contrast, Reasonover and his wife, who was present when the events occurred, testified that appellant Taylor used a police baton to break Reasonover's arm. We agree with the trial court's conclusion that the reporter who prepared this story "arguably strayed from prudent and fair journalistic standards by failing to contact Taylor for his version of the events surrounding the Reasonover incident and by failing to examine certain court documents which may have called into question the accuracy of the sources of information he did consult." However, we also agree with the trial court that this can at best be considered negligence, a standard that does not meet the level required for actual malice.

We also agree with the trial court that the case relied upon by appellant Taylor for the assertion that failure to investigate is actual malice, *Harte–Hanks*, 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562, is distinguishable. In that case, the evidence showed that reporters had reason to doubt their story and purposely chose not to interview witnesses who could refute the allegations they printed. *Id.* at 692, 109 S.Ct. at 2698, 105 L.Ed.2d at 591–592. The court in that case specifically noted, "Although failure to investigate will not alone support a finding of actual malice * * * the purposeful avoidance of the truth is in a different category." *Id.*

The record shows that the reporter in this case did not entertain any serious doubts about the truth of the information he included in his article. He testified that his starting point for information was a copy of the request for action filed by the law department of the city of Toledo, seeking approval of a settlement in the lawsuit filed by Reasonover. The request for action read:

"Upon the police's investigation onto the Reasonover property, Mr. Reasonover, who had been drinking, emerged from the house using profanity and demanding that the police get off his property. A verbal altercation ensued, whereupon Mr. Reasonover went back into his house with Officer Taylor in pursuit with the intent of effectuating an arrest for Disorderly Conduct. Officer Taylor kicked the back glass door to gain entry and thereupon sustained approximately 7 stitches to his leg. Once inside the house, Mr. Reasonover's right arm was broken in an attempt to arrest him. Mr. Reasonover was age 67 at the time of the incident."

The reporter interpreted the statements in the above quote to mean that appellant Taylor broke Reasonover's arm. His interviews with three members of the Reasonover family reinforced his belief. Reasonover's grandson specifically told the reporter that the male officer broke Reasonover's arm. Finally, during his review of the court documents relating to Reasonover's lawsuit, he did not find any information that alerted him that there was any dispute about who broke Reasonover's arm. Accordingly, there is no evidence that the reporter published his statements with knowledge they were false or with reckless disregard regarding whether they were false.

We are also unpersuaded that the use of the word "steamed" to describe appellant Taylor when he entered the Reasonover house is defamatory. Appellant Taylor alleges that the word "steamed" "removes the story from being a possible accidental injury during an appropriate arrest," and results in the accusation that appellant Taylor engaged in police brutality regarding the Reasonover case. As the trial court noted, the common meaning of "steamed" is that the person is angry. Even if appellant Taylor was angry when he entered the Reasonover house, it does not follow that he did not act professionally when he participated in Reasonover's arrest or that Reasonover's arm was intentionally broken. Furthermore, as the trial court noted, the use of the word "steamed" does not show that the reporter knew appellant Taylor did not break Reasonover's arm or that he doubted whether appellant Taylor broke Reasonover's arm. Because there is no evidence of actual malice, the trial court did not err when it granted the Blade summary judgment on appellant Taylor's claim for defamation.

Appellant John P. Smith contends that the Blade defamed him in the June 24, 1995 editorial opinion article, and in the June 25, 1990 article entitled "Police Violence: a costly, recurring problem for city." He alleges that the defamation consists of an assertion that he committed police brutality.

The statement in the June 24, 1995 article to which appellant Smith objects is:

"Roe adds 'We pared it down to cases that seemed to affect the community— alcohol cases where officers were carrying guns, repeated brutality offenders,

domestic violence cases that turned into public brawls, neglect of duty cases.' " John Nichols, 'Secret Files' became 7–month exploration of police misconduct, The Blade, June 24, 1990, at E5.

■ Once again, we agree with the trial court that this statement did not defame appellant Smith because it is not "of and concerning" any one person. Nothing in the statement refers to appellant Smith. Furthermore, pursuant to the innocent-construction rule, the statement can be interpreted as listing some examples of the types of cases the reporters reviewed, rather than an exhaustive list. Finally, when the statement in this article is read in context of the entire series, it is not defamatory.

■ Appellant Smith also contends that he was defamed by the headline of the June 25, 1990 article that read: "Police Violence: a costly, recurring problem for city." In addition, he points to the following statement in that article as evidence of defamation: "But Ms. Henneman claims in her suit that Officer Smith dragged her from the house and down the front porch onto the icy yard, where he 'used violent and excessive force on the plaintiff, including blows to the head, arms, legs, and body with a nightstick.' " Dave Murray and Sam Roe, Police Violence: a costly, recurring problem for city, The Blade, June 25, 1990, at 6. Appellant Smith contends that the Blade knew the allegation was false, because civil juries found Henneman's allegations to be unfounded on two separate occasions. He argues that the Blade had an obligation to mention that the allegation was determined to be unfounded.

The statement appellant Smith complains of was included in a discussion of two lawsuits that citizens filed against appellant Smith alleging that he injured them while arresting them. In his deposition, appellant Smith acknowledged that the sentence he complains of is an accurate summary of the allegations Henneman made in the lawsuit she filed against him. He also acknowledged that the first jury verdict rendered in his favor was reversed on appeal and the cause was remanded for further discovery and a new trial. Finally, he acknowledged that the second jury verdict in his favor was not yet in existence when the Blade ran the article with the statement he alleges is defamatory.

Under these circumstances, we agree with the conclusion of the trial court that the Blade has a valid fair-reporting-privilege defense. We also agree with the trial court that the innocent-construction rule can be applied as a valid defense for the Blade in this instance. The sentence can be read as a simple statement of what allegations were made by Henneman.

In addition, we agree with the trial court that when the whole article is read, no reasonable reader could believe that Henneman's allegations were certainly true. The article contained her version of the events, but it also contained the

information that Internal Affairs was unable to find any evidence to support her version of events. The article also contained information showing that appellant Smith contended that any injury inflicted on Henneman was accidental, and that he could not comment to the reporters because the suit was still pending. Therefore, the trial court did not err when it ruled that the statements were not defamatory as a matter of law.

Finally, we agree with the trial court that appellant Smith has not presented evidence to show with convincing clarity that the Blade acted with actual malice when it initially reported on the lawsuit filed by Henneman against him or when it reprinted the article as part of a reprint of the series that was distributed at a reporter's conference in Detroit, Michigan. The reporter who researched and primarily wrote the story testified that he did not mention the first jury verdict in appellant Smith's favor because his research showed that the finding in appellant Smith's favor was reversed on appeal. He concluded that the first jury verdict was a nullity.

He did not mention the second jury verdict in appellant Smith's favor, because, as we have already noted, the verdict did not exist when the article was initially published. He did not learn of the second jury verdict before the reprint of the article was distributed, even though another reporter from the Blade wrote an article about the second jury verdict. As the trial court correctly noted, the Supreme Court of Ohio has followed the ruling of the United States Supreme Court that "the mere presence of conflicting stories in a defendant's own files does not establish that the defendant knew that the ad was false, 'since the state of mind required for actual malice would have to be brought home to the persons in [the defendant's] organization having responsibility for the publication' " of the information. *Varanese v. Gall* (1988), 35 Ohio St.3d 78, 81, 518 N.E.2d 1177, 1181, quoting *New York Times Co. v. Sullivan*, 376 U.S. at 287, 84 S.Ct. at 730, 11 L.Ed.2d at 710–711. Therefore, in this case, the evidence shows that the reporter responsible for the reprint of the article did not act with actual malice when he failed to include the information in the reprinted article about the second jury verdict. Because there is no evidence of actual malice, and because other valid defenses we previously discussed applied to appellant Smith's claim of defamation, the trial court did not err when it granted the Blade summary judgment on appellant Smith's claim.

Appellant Martin Schaber bases his claim for defamation on three headlines published on June 24, 1990, along with two headlines, a "key finding," and statements made in an article published on June 25, 1990. The three headlines published on June 24, 1990 about which appellant Schaber complains are (1) "Secret police files reveal crime, cover-up"; (2) "Two decades of crime and cover-up"; and (3) "Citizens pay the price of police wrongdoing." When the

articles accompanying the headlines are read, the reader learns that the article accompanying the first two headlines never refers to appellant Schaber. The article accompanying the third headline does refer to appellant Schaber. The article contains the following statements relating to him:

"Take Dane Glassford's case. In January, 1986, Officer Martin Schaber, a 17–year police veteran who served in Vietnam, struck the 22–year–old printing company worker in the jaw with a flashlight after Mr. Glassford threw a snowball at his police car and ran to avoid arrest.

"Mr. Glassford's broken jaw was wired shut. He sued the city for $350,000 but agreed to a $24,000 settlement.

"Internal Affairs didn't learn of the case until May, 1987, when then-Police Chief John Mason read about the settlement in the newspaper, Lieutenant Navarre says.

"Mr. Glassford refused to cooperate with Internal Affairs investigators on the advice of his attorney, Lieutenant Navarre says.

"It is not the law department's job to inform Internal Affairs when a lawsuit is filed, Mr. Rosen says, but his investigators always checked with police investigators to find out if they had any knowledge about the allegations.

" 'If they're saying over there they don't know anything about it, I don't know why,' Mr. Rosen says." Dave Murray and Sam Roe, Citizens pay the price of police wrongdoing, The Blade, June 24, 1990, at D4.

Appellant Schaber alleges that the complained-of items from June 24, 1990 create a defamatory implication that he engaged in wrongdoing in regard to the Glassford lawsuit. He concedes that the article contains truthful statements. He did hit Glassford with his flashlight. Glassford's jaw was broken. Glassford did file a lawsuit for the injuries he suffered. The city of Toledo did pay Glassford $24,000 in settlement, and Internal Affairs was not aware of the incident until the chief of police read about the settlement in the newspaper.

We agree with the trial court that when the complained-of headlines are read in conjunction with the contents of the article, no reasonable reader would conclude that appellant Schaber was guilty of wrongdoing in regard to the Glassford lawsuit. We also agree with the trial court that even if such an implication could be shown, there is no evidence to show that the Blade acted with actual malice when it published the statements about the Glassford suit.

 As we previously noted, appellant Schaber also complains about two headlines, a "key finding," and statements made in an article published on June 25, 1990. The two headlines read: "Police violence: a costly, recurring problem for city," and "Despite IA record, a good street cop." The "key finding" read, "A

handful of Toledo police officers have beaten citizens more than once." The statements cited by appellant Schaber as defamatory in the June 25, 1990 articles were (1) "Officer Schaber is one of a handful of officers in the Toledo police division who, according to Internal Affairs files, has beaten citizens more than once," Dave Murray and Sam Roe, Police violence: a costly, recurring problem for city, The Blade, June 25, 1990, at 1; and (2) "Like Officer Schaber, many police officers have to use force in their work. But excessive use of force, Internal Affairs files show, is a costly, recurring, and painful problem." *Id.* Appellant Schaber contends that these complained-of items, read together, create the defamatory implication that he engaged in wrongdoing and used excessive force.

We agree with the trial court that when the complained-of items are read in context, they are not defamatory as a matter of law. Appellant Schaber admits that the city has paid money to settle lawsuits filed by citizens who sued for injuries inflicted upon them by police officers who were acting in their official capacities, and that the lawsuits are a continuing problem. Therefore, the headlines that inform the reader that police violence is a costly, recurring, and painful problem are truthful.

He also admits that he did strike two different persons with his flashlight on two separate occasions. He points out, however, that Internal Affairs files only reflect one incident, since Glassford chose to file a lawsuit and not to file a complaint with Internal Affairs. We agree with the trial court that the minor discrepancy of saying "according to Internal Affairs files" versus "according to an Internal Affairs file and court records" to identify the source of the information that appellant Schaber hit two persons is not defamatory.

Finally, appellant Schaber admits that the article accompanying the headline "Despite IA record, a good street cop" did not defame him. As the Twelfth District Court of Appeals has said:

"When a claim is made that a newspaper headline or the item to which it is attached are defamatory, they must be construed together in determining the defamatory effect of either. * * * If they are false and were published with a malicious intent, they constitute a libel that will support an action for defamation." *Robb v. Lincoln Publishing (Ohio), Inc.*, 114 Ohio App.3d at 617, 683 N.E.2d at 837.

We find that the headline in question is subject to the innocent-construction rule, because it can be interpreted as simply meaning that appellant Schaber is a good street cop even though he has an Internal Affairs record. We further find that even if the headline was not subject to the innocent-construction

rule, when it is read in context with the accompanying article, it is not defamatory.

The article shows that Internal Affairs gave a written reprimand to appellant Schaber for using his flashlight as a nightstick when arresting a citizen; therefore, he has an Internal Affairs "record." However, the article also contains information showing that appellant Schaber had been shot and injured while he was trying to arrest a suspect, and that he had only been returned to active duty a few weeks before the incident for which he was reprimanded. Appellant Schaber told a lieutenant a short time later that he felt that he needed to get off the streets. He transferred to the mounted patrol and had patrolled the downtown streets four years before the Blade published the article and headline now in dispute. Finally, the article revealed that appellant Schaber has received numerous commendations during his career and is considered a good street cop. Because we agree with the conclusions of the trial court that appellant Schaber was not defamed by the Blade, we find that the trial court did not err when it granted summary judgment to the Blade on appellant Schaber's claim for defamation.

Appellant Robert Case argues that he was defamed by two statements made in the opinion editorial article the Blade published on June 24, 1990. The statements were:

(1) "Roe adds 'We pared it down to cases that seemed to affect the community—alcohol cases where officers were carrying guns, repeated brutality offenders, domestic violence cases that turned into public brawls, neglect of duty cases.'" John Nichols, 'Secret Files' became 7–month exploration of police misconduct, The Blade, June 24, 1990, at E5;

(2) "Once they had done this, the pair set out to recreate key incidents, talking with persons associated with those cases: the officers, their commanders, victims, and bystanders." *Id.*

As we have discussed in regard to this complaint with previous appellants, we agree with the trial court that because these statements are not "of and concerning" any one individual, they are not defamatory. Even though appellant Case showed that the reporters in question never talked with him to prepare their stories, no defamation exists in their saying that officers and their commanders were contacted in preparation for this series, as the record shows the reporters did talk with several officers and commanders. Finally, the statements are subject to the innocent-construction rule, as they can be interpreted as examples of the types of cases reviewed and of the types of methods used to develop the special series of articles.

Appellant Case also complains that he was defamed by a headline published on June 25, 1990 on the front page that read: "Police Violence: a costly, recurring problem for city." The article accompanying the headline begins on page one and continues on page six. No mention is made of appellant Case anywhere in the article. As we previously discussed, a headline must be considered in context. We agree with the trial court that appellant Case was not defamed by the headline in question.

Appellant Case also complains that he was defamed by the information published about him in an article that appeared on page seven in a shaded box at the bottom of the page. The article was titled "Other key cases." The information published was:

"Officer:

"Sgt. Robert Case

"Appointed:

"July 12, 1976

"Date of Incident: Oct. 18, 1984

"Narrative:

"Sgt. Robert Case takes 70–year old William Eichenlaub to the Lucas County jail to be booked for driving while intoxicated. *While waiting in the booking line, Sergeant Case pulls on the man's left arm, dislocating his elbow, according to a lawsuit* filed against the officer and the city. 'He took the handcuffs off me,· but he grabbed my left arm, and he put a hammer lock on me,' *Mr. Eichenlaub now says. 'He just gave my arm a yank up and popped it out of the socket.'* He is taken to St. Vincent Medical Center, where he undergoes surgery. Mr. Eichenlaub spends the next nine months recovering.

"Disposition: Mr. Eichenlaub sues for $400,000. On March 8, 1988, the city settles out of court for $10,696—Mr. Eichenlaub's final medical bill.

"Footnote: Internal Affairs records show the unit never investigated the incident. Sergeant Case is still on the force." (Emphasis added.) Other key cases, The Blade, June 25, 1990, at 7.

Appellant Case argues that the statements that he dislocated Eichenlaub's elbow were false, and that the Blade acted with actual malice when it printed the statements. He says that the reporters would have had reason to doubt the truth of the allegations made by Eichenlaub if they had read Eichenlaub's own deposition testimony in the civil lawsuit that was settled. Eichenlaub admitted in his deposition that he did not think that appellant Case meant to hurt him. He

also admitted that he told a bank teller that he hurt his arm in a car accident that was the basis for appellant Case putting him under arrest.

We agree with the trial court that the Blade has several valid defenses to appellant Case's claim that he was defamed. First, the fair-report privilege applies. The statements in the article about which appellant Case complains were accurate summaries of the allegations made by Eichenlaub in the civil suit he filed for his injuries and his expansion on the meaning of his allegations. See *Ratliff v. McGlamery* (Nov. 23, 1988), Lorain App. No. 4387, unreported, 1988 WL 126704.

Second, there is no evidence that the Blade acted with actual malice when it published the statements. The reporter who wrote the article testified that he had no intent to imply that appellant Case used excessive force. Furthermore, he testified that he had not seen Eichenlaub's deposition. The items he did see, including the complaint and the request for jury instructions, along with his interview of Eichenlaub were all consistent that Eichenlaub alleged that appellant Case had dislocated his elbow. As we have previously discussed, the failure to review all available sources may be considered poor journalism or negligence, but those standards do not meet the standard required to show actual malice. See *Harte–Hanks, Inc. v. Connaughton*, 491 U.S. at 692, 109 S.Ct. at 2698, 105 L.Ed.2d at 591–592. The trial court did not err when it granted the Blade summary judgment on appellant Case's claim for defamation.

Appellant Michael Early contends that he was defamed by an implication that he had been drinking alcohol before he became involved in an incident while off duty in which he shot a citizen. He says that the implication is created by a combination of headlines and articles published as part of the series.

He first points to a headline and two statements published on June 24, 1990, along with a statement from a television advertisement as the defamatory statements. The headline, published on page five of section E in the paper on June 24, 1990, read: " 'Secret Files' became 7–month exploration of police misconduct." The headline accompanied the editorial opinion piece written by John Nichols, which several other appellants have complained of as defaming them.

Appellant Early objects to two statements in the article. The statements are:

"Roe adds 'We pared it down to cases that seemed to affect the community—alcohol cases where officers were carrying guns, repeated brutality offenders, domestic violence cases that turned into public brawls, neglect of duty cases.' " John Nichols, Secret Files' became 7–month exploration of police misconduct, The Blade, June 24, 1990, at E5;

" 'We went out and interviewed victims of police misconduct,' Roe says." *Id.*

The statement from the television commercial to which appellant Early objects was: "It is inconceivable that this kind of Toledo Police misconduct has been hidden from view for seventeen years."

As we have previously discussed, we agree with the trial court that the headline and statements in the editorial opinion article were not defamatory. The statements are subject to the innocent-construction rule, because they can be read as a sampling of the types of cases reviewed by the reporters. In addition, the statements do not defame appellant Early, because they are not "of and concerning" any one individual. These same reasons apply to the complained-of line in the television advertisement.

Appellant Early next points to (1) a statement published on June 28, 1990 on page six of The Blade, (2) two headlines published on June 29, 1990, (3) a recap statement published on June 30, 1990, and (4) a statement published on July 1, 1990. He argues that these items taken together defame him.

The June 28, 1990 statement appears in a small shaded box in the far right column of page six, and reads:

"YESTERDAY:

"Domestic violence among married and dating police officers is cause for public concern.

"TOMORROW:

"Internal Affairs files and other records reveal numerous instances in which officers have used their guns not to protect the public good but to undermine it.

"And although the cases vary, there is a startling common denominator. The officers are invariably off duty and drinking alcohol.

"While drinking, off-duty officers have used their guns to kill and injure innocent people, put bystanders at risk, and threaten people in their personal lives."

The first headline from June 29, 1990 that appellant Early complains of appeared on the first page and read: "Armed and dangerous: When firearms and alcohol combine, the result may prove deadly." The article accompanying that headline continued on page six, where a second headline was printed to accompany the article. The second headline read: "Armed And Loaded: Guns, alcohol: a deadly mix." Appellant Early is never referred to in the article that starts on page one, continues on page six, and is accompanied by the complained-of headlines. The article that does refer to appellant Early is headlined: "Since 1985, a third of police gunfire ruled accidental." The article accompanying the headline contained the following information regarding appellant Early:

"In recent years, many shots ruled accidental have also injured citizens.

"For example, in March, 1987, Officer Michael Early, off duty and not in uniform, intervened in a traffic dispute at the intersection of Upton and Central avenues. When Officer Early walked in front of a car driven by David Stalma, the car bumped him. The officer went to the open driver's side door and reached in to turn off the ignition. But the car drove off with him hanging on.

"The officer, Internal Affairs investigators later concluded, was not carrying his police badge, and Mr. Stalma and his brother, Gary, a passenger, were not convinced he was a policeman.

"The officer had his gun drawn during the precarious ride, and a shot was fired during a struggle, hitting 21–year–old Gary Stalma in the chest. Mr. Stalma was admitted to Toledo Hospital in serious condition.

"The officer told investigators that he had his finger on the trigger and that the gun went off when the Stalmas pulled on the gun and he pulled back.

"The firearms review board ruled the shooting accidental and ordered Officer Early to receive additional weapons training.

"Deputy Chief Jackson says officers should be required to go to the shooting range several times a year to practice shooting and handling their guns. Now, there is no required practice.

"And practice, he says, is now imperative as the division switches from .38 revolvers to 9mm semiautomatic handguns.

" 'Once you press that trigger,' Deputy Chief Jackson says, 'the next shot is just a touch of that trigger. *Boom! Boom! Boom! Boom!* '

"Had Officer Early fired a semiautomatic gun in the 1987 traffic dispute, 'he could have pulled off four or five more rounds into that car,' Deputy Chief Jackson says." Sam Roe and Dave Murray, Since 1985, a third of police gunfire ruled accidental, The Blade, June 29, 1990, at 6.

Appellant Early does not dispute the truth of any of these statements.

Instead, appellant Early points to two additional statements that he says further contributed to the false impression that he was drinking alcohol before intervening in the traffic dispute and accidentally firing his gun. The first of the two additional statements was published on June 30, 1990 on page six. It appeared in a small, shaded box in the far right column of page six. The statements in the shaded box were:

"YESTERDAY

"*Drinking by armed off-duty officers—a violation of state law—has resulted in one killing and has threatened the lives of dozens of citizens.*

"TOMORROW

"What can be done about police misconduct in Toledo? There are many possible solutions say citizens, law enforcement personnel, and national experts.

"One hotly debated idea is civilian oversight, a system already in place in cities such as Cleveland, Detroit, and Cincinnati.

"Also, a review of the police division's background checks of officer applicants reveals that some recruits had been convicted of drug possession, driving while intoxicated, assault, and disorderly conduct, among other crimes." (Emphasis added.) The Blade, June 30, 1990, at 6.

Appellant Early objects to the first statement, which is italicized in our quote.

The final statements appellant Early objects to were published on July 1, 1990. The statements appeared in a shaded box that covered the bottom quarter of page six. The shaded box is titled "An overview of the series." The specific statements pointed to by appellant Early were the summary that appeared under the title "Friday: Armed and loaded." The statements were: "Records reveal numerous instances in which officers have used their guns not to protect the public good but to undermine it. While drinking, armed officers have killed and injured innocent citizens and have threatened people in their personal lives."

■ We have carefully considered all of appellant Early's contentions, and conclude that he is not defamed by any of the complained-of statements. Neither the headlines nor any of the articles accompanying the headlines he complains of referred to appellant Early. Appellant Early is not referred to in the complained of summaries. The one article that does refer to appellant Early makes it clear his off-duty shooting of a citizen was ruled accidental, and nothing in the article would lead a reader to believe that he was drinking alcohol before the incident occurred. We agree with the trial court that because the statements cited by appellant Early are not "of and concerning" him, because the statements complained of by appellant Early are subject to the innocent-construction rule, because the account in the article referring to appellant Early qualifies for the fair-report privilege, and because there is no proof of falsity regarding any of the published statements about appellant Early, appellant Early's claim for defamation must fail as a matter of law. The trial court did not err when it granted the Blade a summary judgment on appellant Early's claim for defamation.

■ Appellant Robert Barboza is the final appellant to claim he was defamed by the Blade. He admits that he did commit one act of misconduct. However, he complains, "[L]ike Officer Early, the Blade, by headlines, captions, a second article, and other text went far beyond the mere facts of such one-time act of drinking on duty. It characterized him as being an alcohol abuser, drinking from

the bottle, and unfit to be on the police force or to be selected to join the police department, and as having an association with the Beast."

Appellant Barboza first complains of four items that were published by the Blade on June 30, 1990. The four items are (1) a key finding listed at the top of page one in a shaded box that read, "While dozens of officers have been caught abusing drugs or alcohol the last two decades, Internal Affairs records show only four have been ordered into treatment programs," (2) the headline that appears below the key finding box that read: "Drink, drugs: A problem in blue" and a photo of appellant Barboza that appeared below the headline along with the photos of two other officers, (3) a statement that appears in the article under the complained of headline that reads, "Records provide other clues about how the Toledo police division treats its alcohol problem: In the last two decades, according to Internal Affairs documents, only four officers have been ordered into substance-abuse treatment," and (4) a graphic illustration that appeared on page six showing a shadow figure of an officer in uniform drinking from a bottle. Appellant Barboza says that these items, combined, create the defamatory impression that he is an alcohol abuser who needs substance abuse treatment, and that he drinks alcohol straight from a bottle.

Once again, when the complained-of items are read in context, it becomes clear they are not defamatory. The key finding is a truthful statement, and does not identify appellant Barboza as one of the officers required to have substance abuse treatment. The contents of the article following the complained-of headline show that alcohol and drug abuse does pose a problem for the police department. Appellant Barboza's picture is printed along with the pictures of two other officers because a brief summary of their cases appears just below the pictures. The summary relating to appellant Barboza reads:

"Officer: Robert Barboza.

"Incident: Drank on duty and drove patrol car 62 mph down South End residential streets, yelling profanities out the window and racing around corners, tires squealing.

" IA Charge: Intoxication and Conduct Unbecoming an Officer.

"Disposition: 20–day suspension." Dave Murray and Sam Roe, Drink, drugs: a problem in blue, The Blade, June 30, 1990, at 1.

Just below the three summaries, the reporters continued the article by posing the question whether the three summarized cases were isolated incidents. They answered their question "no" and then explained, in the article, that drug and alcohol abuse is often the cause for serious charges filed through internal affairs. They further explained that the problem is not unique to this particular police force. They explained how the problem is dealt with by other forces, and

contrasted the other approaches with the approach applied in Toledo. In that context, they said that records show that only four officers had been required to seek substance abuse treatment. Nothing about the context of that statement would lead the reader to conclude that appellant Barboza had to be one of those four officers.

In addition, nothing about the graphic on page six would lead a reasonable reader to conclude that it depicts appellant Barboza. A more expanded version of the events that led to appellant Barboza's twenty-day suspension for intoxication on duty and sexual harassment does appear on the same page. However, nothing in the article suggests that he was drinking alcohol straight from a bottle. Instead, the article contained the statement "She told Internal Affairs investigators that, after waiting an hour and a half, she went to get her partner and found him in the backyard, drinking beer near the pool and talking to four men, later identified as off-duty officers." Dave Murray and Sam Roe, Drink, drugs: A problem in blue, The Blade, June 30, 1990, at 6. In addition, the balance of the page contains accounts of other officers who were disciplined for actions they took while under the influence of drugs or alcohol and statistical information demonstrating the severity of the problem. Under the innocent-construction rule, the graphic can be interpreted as merely representing officers who have substance abuse problems.

Appellant Barboza next complains that the Blade defamed him on July 1, 1990 when it published an article titled "Past problems, future solutions: Are we hiring the best?" The article contained the following statements about appellant Barboza:

"Robert Barboza was hired in 1979 even though a background investigation found he had been arrested three times for drunk and disorderly conduct and once for resisting arrest.

"Five years after joining the force, he was relieved of duty after his partner complained that, while on duty, he had stopped at a police pool party to drink beer, had driven recklessly, and was drunk. Still on the force, he was suspended 20 days." Dave Murray and Sam Roe, Past problems, future solutions; Are we hiring the best? The Blade, July 1, 1990, at 1 and 6.

Appellant Barboza does not contest the truth of the facts reported. Instead, he argues that the report should have been balanced with more facts that are in his favor.

For instance, appellant Barboza believes that the article should have contained the information that his drunk-and-disorderly arrests happened when he was eighteen years old. He thinks the reporters should have revealed that he entered the U.S. Marine Corps and served in the Vietnam War before he was

decorated and honorably discharged. He also thinks that the report should have included the information that he worked at Champion Spark Plug for ten years without incident before he was hired to be a police officer. He says that because these favorable facts were not reported, the Blade article created the defamatory impression that he was not fit for service on the police force.

The Supreme Court of Ohio has noted that journalists of necessity make a selection "as to what is newsworthy. The relevant question is whether that selection is made with a view toward dissemination of false information." *Perez v. Scripps–Howard Broadcasting Co.* (1988), 35 Ohio St.3d 215, 220, 520 N.E.2d 198, 204. In this case, we conclude that the selection of material to be reported about appellant Barboza's background did not result in the reporting of an untruth. Furthermore, to the extent a reader might get the impression that it was the opinion of the reporters that appellant Barboza was not a fit candidate for the police force, the opinion is protected by Section 11, Article I of the Ohio Constitution. See *Vail v. Plain Dealer Publishing Co.*, 72 Ohio St.3d at 283, 649 N.E.2d at 186; see, also, *Scott v. News–Herald*, 25 Ohio St.3d 243, 25 OBR 302, 496 N.E.2d 699.

Finally, appellant Barboza says that the Blade defamed him on June 30, 1990 by publishing his badge number at the time of the incident for which he was disciplined, and by publishing a statement on June 30, 1990 from a police command officer about the quality of recruits. The badge number assigned to appellant Barboza at the time of the incident in question was 666. Appellant Barboza argues that many people associate that number with "The Beast" from the book of Revelation in the Bible. He argues that the Blade meant to imply that he is connected with Satan or with "The Beast" when it reported his badge number. He stresses that the Blade did not publish the badge number of any other officer, and that he had a new badge number assigned to him by the time the article was published. He says that the intent of the Blade is made clear by the statement it published the following day regarding the quality of police recruits.

The statement about the quality of recruits was the following quote: " 'The kind of people we are recruiting is appalling,' says a police command officer and former recruiter who requested anonymity. 'You look at some of them and say, "How in the devil did they get here?" ' " Dave Murray and Sam Roe, Are we hiring the best? The Blade, July 1, 1990, at 6. Appellant Barboza places great emphasis on the officer's use of the word "devil" in his quote.

Like the trial court, we find that no reasonable reader would conclude after reading the statements in context that The Blade was asserting that appellant Barboza has a connection to Satan or to "The Beast." We also agree that the

innocent-construction rule applies. The report of the badge number is completely innocent if taken at face value, and the quote from the command officer shows that he has reservations about the quality·of some of the recruits. The trial court did not err when it granted summary judgment to the Blade on appellant Barboza's claims for defamation.

Because we have concluded that the trial court did not err when it granted summary judgment to the Blade on each of the claims for defamation brought by appellants, we find appellants' third assignment of error not well taken. We now consider appellants' fourth assignment of error, in which appellants Kimberly L. Kristoff, Jane Lewis, and Linda Leichty contend that the trial court erred when it granted summary judgment to the Blade on their claims for invasion of privacy.

 Appellants Kristoff, Lewis, and Leichty allege that they presented evidence showing that all the elements of their cause of action exist in this case. Ohio courts have recognized that five elements must be proved to establish a claim for invasion of privacy by publication of private facts. Those five elements are:

"(1) There must be publicity; the disclosure of a public nature, not private. 'Publicity' means communicating the matter to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge as opposed to 'publication' as that term of art is used in connection with liability for defamation as meaning any communication by the defendant to a third person.

"(2) The facts disclosed must be those concerning the private life of an individual, not his public life. There is no liability when the defendant merely gives further publicity to information about the plaintiff that is already public, such as matters of public record about his birth or marriage date, or matters that the plaintiff leaves open to the public eye, such as kissing his spouse in public.

"(3) The matter publicized must be one which would be highly offensive and objectionable to a reasonable person of ordinary sensibilities.

"(4) The publication must have been made intentionally, not negligently.

"(5) The matter publicized must not be a legitimate concern to the public. A newspaper's publicizing 'legitimate news' ordinarily will not be actionable." (Citations omitted.) *Killilea v. Sears, Roebuck & Co.* (1985), 27 Ohio App.3d 163, 166–167, 27 OBR 196, 199–200, 499 N.E.2d 1291, 1294–1295.

Keeping these factors in mind, we now consider the arguments of the three appellants pursuing claims for invasion of privacy by publication of private facts.

 All three appellants in question were named as victims of violence perpetrated on them by officers who were their spouses or dates. Appellant

Leichty and appellant Lewis were both named in an article on ex-officer Donald Lewis that was published on June 26, 1990 at page 6. Ex-officer Lewis was fired from the force some eleven years before the story was published, and was deceased for a year before the story was published.

The story revealed that appellant Leichty was his first wife, and appellant Lewis was his second wife. The story also revealed that appellant Leichty divorced ex-officer Lewis after a series of incidents of domestic violence. Appellant Leichty did file charges against her then husband, but always dropped the charges before he was prosecuted. The reporters stated, "Internal Affairs does not investigate any of her cases, as investigators either were not notified, ruled the allegations too sketchy, or decided the courts could handle any penalties." Other key domestic violence cases, The Blade, June 27, 1990, at 4. The Blade reporters learned about the incidents by reviewing the Internal Affairs file on ex-officer Lewis. Appellant Leichty was divorced from ex-officer Lewis for fifteen years before the article was published.

Appellant Lewis was widowed when ex-officer Lewis died a year before the article in question was published in the Blade. The article contained the information that ex-officer Lewis allegedly "punched out" a bar patron who said he was trying to stop ex-officer Lewis from beating appellant Lewis. Twenty days after the fight, ex-officer Lewis was fired from the police force. Appellant Lewis acknowledges that the bar patron did claim that her husband was beating her and he got struck when he tried to intervene, but she says that the bar patron was wrong.

Appellant Kristoff, who is a police officer, was identified by name on two separate occasions and by photograph on one occasion, as the victim of violence committed by a male police officer she had dated for a time. The first time she was identified by name and photograph was on June 27, 1990. Her photograph, the photograph of the male officer who committed the violence, and the photograph of another female police officer who was also a victim of the male officer's violence, appeared in a shaded box near the top of page four. The text accompanying the photos explained that the male officer was accused of "beating or menacing no fewer than six girlfriends, two of them fellow officers," The Blade, June 27, 1990, and named the two female officers. The information was included in a series of articles about domestic violence committed by officers.

The reporters for the Blade named appellant Kristoff for the second time in an article published on June 29, 1990. In a series of articles about the misuse of firearms by officers, particularly when the officers were off duty, the reporters included the details of what happened to appellant Kristoff. The male police officer she dated for a time came to her home in the early morning hours. He was drunk and angry because she had begun dating other officers. He overheard

her talking with someone on the telephone on an earlier occasion. He asked to whom she was talking at the time, but she would not tell him. When he arrived at her apartment, he again demanded to know who she was speaking to on the phone at the earlier time. When she still refused to tell him, he pinned her down and pulled the trigger on his gun, which he had placed between her legs. He pulled the trigger twice before she told him who she had talked with on the phone. He then showed her that the chamber in his gun was empty.

Internal Affairs investigated the incident and initially chose not to pursue it, because of the male officer's denials that it had ever happened. However, the complaint was reinvestigated when a second female police officer filed a domestic violence complaint against the same male police officer two years later. Internal Affairs found at least six women who alleged that the same male officer had been abusive toward them in dating relationships. The male officer was suspended for five days for conduct unbecoming an officer.

Appellants Leichty, Lewis, and Kristoff all argue that the Internal Affairs files were not public records when the information concerning their various incidents as victims was compiled. They acknowledge that the legislature subsequently amended the public records laws in Ohio to render Internal Affairs files public. They argue, however, that they had a privacy interest in the information that could not be divested by subsequent amendments to the public record laws in Ohio, and records made prior to the date the law was amended remain private. Finally, they argue that the information was too old to be considered of legitimate concern to the public.

 While appellants Leichty, Lewis, and Kristoff are correct that the Internal Affairs files were not considered public records when the information about their victimization was collected, they are not correct when they argue that the subsequent changes in Ohio law did not render the files public. The Supreme Court of Ohio ruled in 1980: "Law enforcement records compiled before the amendment of R.C. 149.43 are available to the public provided they are public records as defined by R.C. 149.43 and are not exempted from disclosure by its provisions." *State ex rel. Beacon Journal Publishing Co. v. Univ. of Akron* (1980), 64 Ohio St.2d 392, 18 O.O.3d 534, 415 N.E.2d 310, syllabus. The Supreme Court of Ohio said:

"Concededly, the creation of the records took place prior to the legislative amendment at issue, but this is not the conduct regulated by the statute. R.C. 149.43 deals with the availability of public records, not with the recordation function of governmental units. The date the records were made is not relevant under the statute. Since the statute merely deals with record disclosure, not record keeping, only a prospective duty is imposed upon those maintaining public records." *Id.* at 396, 18 O.O.3d at 537, 415 N.E.2d at 313.

Accordingly, the trial court did not err when it ruled that the appellants in question failed to prove an essential element of invasion of privacy by publication of private facts: the facts publicized were not private, they were already part of the public record. See *Killilea v. Sears, Roebuck & Co.*, 27 Ohio App.3d at 166–167, 27 OBR at 198–200, 499 N.E.2d at 1294–1295.

Furthermore, we agree with the trial court's conclusion that this information was of legitimate public interest, even if it was several years old when it was reported. As the trial court noted, the information was not previously available because police Internal Affairs files were not considered public records until the Supreme Court of Ohio ruled that they were shortly before the reporters started their investigation in this case. Accordingly, while the information was about long past incidents, it was of legitimate public interest because the information had never before been released to the public. In addition, the discussion of the incidents that happened to these victims was part of a larger view of the internal workings of the police department and how it handled police officers who were alleged perpetrators of violence on their spouses and dating partners.

 Finally, we find it unfortunate that the Blade chose to report these appellants' names, but agree with the trial court that the revelation of their identities is not legally actionable as an invasion of the right to privacy by the publication of private facts. As the trial court noted, precedent from the United States Supreme Court has established that the subject matter of the article as a whole, rather than the publication of a specific individual's identity, must be considered to decide if the information published is newsworthy. *Florida Star v. B.J.F.* (1989), 491 U.S. 524, 536–537, 109 S.Ct. 2603, 2610–2611, 105 L.Ed.2d 443, 457–458. In this case, the manner in which the police force handled complaints about domestic violence perpetrated by its own officers was certainly newsworthy. In addition, as the trial court noted, the United States Supreme Court has made it clear that once the government makes public the names of victims of crimes:

" '[R]eliance must rest upon the judgment of those who decide what to publish or broadcast' *Cox Broadcasting* [*Corp. v. Cohn* (1975),] 420 U.S. [469] at 496, [95 S.Ct. 1029, 1046–1047, 43 L.Ed.2d 328, 350] and hopes for restitution must rest upon the willingness of the government to compensate victims for their loss of privacy and to protect them from the other consequences of its mishandling of the information which these victims provided in confidence." *Florida Star v. B.J.F.*, 491 U.S. at 538, 109 S.Ct. at 2612, 105 L.Ed.2d at 458.

The Blade lawfully obtained the names of these three appellants and is not legally liable for making the questionable decision to reveal their identities to the public even though they committed no personal wrongdoing and were merely

victims of offenses committed by police officers. Appellants' fourth assignment of error is not well taken.

The judgment of the Lucas County Court of Common Pleas is affirmed. Appellants are ordered to pay the court costs of this appeal.

*Judgment affirmed.*

HANDWORK, P.J., GLASSER and MELVIN L. RESNICK, JJ., concur.